Christine CASTRO, Plaintiff,

v.

LOCAL 1199, NATIONAL HEALTH and HUMAN SERVICES EMPLOYEES UNION, Dennis Rivers, Patricia Harris, Eustace Jarrett, and Steve Frankel, Defendants.

Civ. No. 1778(LAP).

United States District Court,
S.D. New York.

April 23, 1997.

Dominic E. Ezeudu, Law Office of Dominic E. Ezeudu, Jamaica, NY, for plaintiff.

Elisabeth A. Werby, Eisner Levy Pollack & Ratner, New York City, Marc H. Pillinger, Smith, Mazure, Director & Wilkins, P.C., New York City, for defendants Local 1199, National Health & Human Services Employees Union, Dennis Rivera, Patricia Harris and Eustace Jarrett.

Carren Shulman, Lowenthal, Landau, Fischer & Bring, P.C., New York City, for defendant Steve Frankel.

## MEMORANDUM AND ORDER

PRESKA, District Judge:

Plaintiff brings this action against her former employer and its agents for employment discrimination pursuant to 42 U.S.C. § 2000e et set. ("Title VII"), 42 U.S.C. § 1981, 29 U.S.C. 621 et seq. (the Age Discrimination in Employment Act ("ADEA")), 42 U.S.C. § 12101 et seq. (the Americans with Disabilities Act ("ADA")), and N.Y. Executive Law § 296, ("NYHRL"), as well as a variety of state law theories including fraud, breach of contract, assault, and intentional infliction of emotional distress. Defendant Local 1199, National Health and Human Services Employees Union ("union"), has moved for summary judgment of these claims pursuant to Fed.R.Civ.P. 56. Individual defendant Steve Frankel has also moved for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

## BACKGROUND

The facts, drawing all justifiable inferences in favor of the non-movant, are as follows: Plaintiff is an Hispanic woman, now in her mid-forties, who has asthma. (Complaint, ¶ 5). She obtained a position with the defendant union in 1986 to work as an organizer. (Castro Dep., February 26, 1996, at 145). Plaintiff's position required that she work both indoors and outdoors. (Castro Dep., February 27, 1996 at 143). Plaintiff spent a majority of her time indoors working at her desk or attending meetings. (Id. at 130–31).

As necessary, plaintiff also occasionally led picket lines outdoors. (Id. at 142). Plaintiff's doctor advised her to avoid extreme temperatures because it aggravated her asthma symptoms. (Complaint, at ¶ 54–55). This was the only restriction that plaintiff was required to observe that limited her employment. (Castro Dep., February 27, at 141–42). In her deposition, plaintiff stated, "I was willing and capable of performing my duties. The only accommodation that I got—I wanted was that in extreme cold or heat, that I was not to be standing outside in the cold." (Id.).

Plaintiff's relationship with her employer became strained early on in her employment. (Harris Aff., at 5.) The record is replete with documentation of the various conflicts that arose between plaintiff and the union. (Defendants' Exhibits E–G). Most of the friction between plaintiff and the defendants resulted from her excessive absenteeism. (Defendants' Exhibits B–G). Plaintiff argues that her absences were largely attributable to symptoms resulting from her asthma. Defendants contend, and offer documentation, that plaintiff gave a wide variety of excuses for her absences, of which asthma was not the predominant reason; this documentation includes plaintiff's own memos addressed to upper management regarding her absences in which she offers excuses such as leg pain, back pain, chest pain, stomach pain, gynecological problems, etc. (Defendants' Exhibits B–H). Because her absences had become so frequent, in January 1992, plaintiff agreed to allow the Union to deduct money from her paycheck to make up for the excess. (Harris Aff., at 6).

The first instance plaintiff sets forth as evidence of racial discrimination occurred in December, 1993. At that time, an anonymous sender placed a photograph of plaintiff and the Reverend Jesse Jackson in plaintiff's mailbox at work; the words "you are just a white token" appeared scrawled across the picture. (Complaint, ¶ 64).

---

1. Plaintiff cross-moved for summary judgment, but failed to follow local Rule 3(g) or my individual rules in doing so. Moreover, plaintiff failed to come forward with sufficient evidence to withstand defendants' motions as discussed below. Thus, even if I were willing to overlook the procedural irregularities of plaintiff's motion, it would still be unavailing.

On January 10, 1994, plaintiff went on an extended disability leave due to her asthma symptoms. (*Id.* at ¶ 20). When she returned on April 4, 1994, plaintiff claims that the union refused to allow her to resume her usual position as an organizer and that this was an act fueled by the Union's discrimination against her on a host of bases. (*Id.* at ¶ 22). On April 8, 1994, at a routine meeting, plaintiff asked her supervisor, Patricia Harris, why she was not assigned to her usual responsibilities. (Castro Dep., August 7, 1995, at 79). Plaintiff claims that Harris was unresponsive to her concerns and that defendant Steve Frankel became upset with plaintiff at this meeting and threatened her.[2] (*Id.* at 90).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 13, 1994 on the basis of national origin, age, and disability and then went on disability leave again from April 14, 1994 until May 9, 1994. (Complaint, ¶¶ 25–30). Following her return from disability leave, plaintiff claims that she was subject to treatment as a "pariah" and suffered complete ostracism by the union and its agents. (*Id.* at ¶ 31). Following the filing of her EEOC complaint, plaintiff claims that the defendants made disparaging comments in her presence about age and race. Plaintiff asserts that while in her presence, the defendants commented that the union needed "young blood" and that this is evidence of age discrimination. (Complaint, ¶ 65). In addition, plaintiff claims that her supervisor, defendant Harris, asked plaintiff on a number of occasions to refrain from speaking Spanish in front of non-Spanish speaking employees and that this is evidence of racial discrimination. (Castro Dep., March 25, 1996, at 63).

The tension between plaintiff and the union continued to escalate until June, 1995 when her elected term expired,[3] and the un-ion terminated her employment at that time. (Castro Dep., February 27, 1996, at 162). Following her dismissal by the Union, plaintiff filed suit with this court alleging employment discrimination based on a host of theories which I address below.

## DISCUSSION

### I. Summary Judgment Standard

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994); see Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if the substantive law at issue so renders them. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. *Chambers*, 43 F.3d at 36. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *accord Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may

---

**2.** The facts of this incident are discussed more fully in the section of this opinion which addresses plaintiff's assault claim against individual defendant Steve Frankel. *See infra* part IV.D.3.

**3.** Under the 1199 union constitution, an organizer may be appointed by the union president or elected by the delegate. (Defendants' Exhibit A;

Art. VII(2)(1) of the constitution). The president has the authority to terminate only appointed organizers; an elected organizer must remain employed until her term expires. (*Id.*). In the present case, plaintiff was an elected organizer and was dismissed immediately upon the expiration of her term.

obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Instead, the nonmovant must "'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise.'" *Trans Sport v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

In assessing materials such as affidavits, exhibits, interrogatory answers, and depositions to determine whether the moving party has satisfied its burden, the court must view the record "in the light most favorable to the party opposing the motion" by resolving "all ambiguities and draw[ing] all factual inferences in favor of the party against whom summary judgment is sought." *Chambers,* 43 F.3d at 36. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the moving party, summary judgment is improper." *Id.* at 37 (emphasis added).

## II. *ADA Claim*

In order to state a claim under the ADA, the plaintiff must adequately allege that she suffers from a "disability." Under the statute, a "disability" consists of:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1995). The determination of whether a particular impairment constitutes a disability must be made on a case-by-case basis. *See* 29 C.F.R. pt. 1630, App. § 1630.2(j). ("The determination of whether an individual has a disability is ... based ... on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others....").

The requirement of individualized analysis is particularly appropriate in the context of disability claims relating to asthma. As of 1990, over ten million Americans have been diagnosed with asthma. *United States v. Sherman,* 53 F.3d 782, 787 (7th Cir.1995) (citing National Institute of Health, "CTS About Asthma," Oct. 1990). The severity of asthma varies a great deal among individuals. *Id.* Symptoms may fall anywhere along the spectrum from mild to life-threatening, and the frequency of asthmatic episodes also varies greatly from person to person. *Id.* With proper treatment, however, asthmatic symptoms can almost always be controlled. *Id.* Thus, individualized inquiries are especially useful when determining whether asthma constitutes a disability under the ADA.

As a general matter, courts consider three factors when determining whether a plaintiff has sufficiently alleged a disability under the objective prong of the definition: "whether the plaintiff's condition is a physical or mental impairment; (2) whether the impairment affects a major life activity; and (3) whether the major life activity is substantially limited by the impairment." *Cerrato v. Durham,* 941 F.Supp. 388, 391–92 (S.D.N.Y.1996); *Pacourek v. Inland Steel Co.,* 858 F.Supp. 1393, 1404 (N.D.Ill.1994). According to the regulations accompanying the ADA, a physical or mental impairment is a physiological disorder or condition which affects one or more of a listed group of body systems. Regulations to Implement Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. § 1603.2(h)(1) (1996). Asthma is a physiological disorder or condition that af-

fects the respiratory system.[4] *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Plaintiff claims that her asthma affects her ability to breathe.

Many courts addressing the issue, however, have found that asthma does not substantially limit the particular plaintiff's ability to work or breathe and therefore does not constitute a disability under the ADA or Rehabilitation Act.[5] *See Ventura v. City of Independence,* 1997 WL 94688, 1997 U.S.App. Lexis 4102, at *7 (6th Cir.1997) (finding that plaintiff, an asthmatic, was not disabled under the ADA where he was able to engage in a number of activities including occasional running, football, calisthenics, playing the saxophone, and water-skiing, that belied his claim that his ability to breathe and work were significantly restricted); *Gaddy v. Four B Corp.,* 953 F.Supp. 331, 331–32, 337–38 (D.Kan.1997) (finding that plaintiff, a sixteen-year-old girl, who, after being diagnosed as an asthmatic, was able to play volleyball in gym class and perform as a cheerleader, was not disabled under the ADA because her ability to breathe was not substantially limited); *Emery v. Caravan of Dreams,* 879 F.Supp. 640, 642, 645 (N.D.Tex.1995) (finding that plaintiff, an asthmatic, was not disabled under the ADA where she was able to lead a "normal life" that included working continuously as a flight attendant and engaging in activities such as rollerblading).

The leading case in this Circuit on this issue is *Heilweil v. Mount Sinai Hospital,* which falls under the Rehabilitation Act. 32 F.3d 718 (2d Cir.1994). *Heilweil* involved a plaintiff who, subsequent to being diagnosed as an asthmatic, was hired by Mount Sinai hospital to work as a manager. *Id.* at 719. Two years later, her employer transferred her to the hospital's blood bank. *Id.* at 720. Plaintiff's asthma symptoms worsened after her transfer to the blood bank, and her physician told her that the air quality at the facility was the principal cause of her ailments and advised her to stay away from the facility. *Id.* After discussing her concerns with her immediate supervisor, both parties agreed that due to her physical reaction to the environment at the blood bank, plaintiff could no longer work there on a regular basis. *Id.* Her supervisor informed plaintiff that another individual would take over plaintiff's responsibilities, and plaintiff agreed to continue to work and to refrain from seeking other employment until the transition was complete. *Id.* For the next several months, plaintiff never entered the blood bank and administered it from the outside. *Id.* Plaintiff maintained that her health improved and attributed the improvement to the change in her work routine. *Id.* When plaintiff refused to continue to cooperate in facilitating the transition, the hospital terminated her; in response, she filed suit against her former employer under the Rehabilitation Act. *Id.* at 720–21. The Court of Appeals affirmed the District Court's finding that Heilweil was not a handicapped person within the meaning of the Rehabilitation Act. *Id.* at 721. The court reasoned that because plaintiff's respiratory

4. Asthma is described as:

 [A] condition of the lungs in which there is widespread narrowing of airways, varying over short periods of time either spontaneously or as a result of treatment, due in varying degrees to contraction (spasm) of smooth muscle, edema of mucosa, and mucus in the lumen of the bronchi and bronchioles; these changes are caused by the local release of spasmogens and vasoactive substances (e.g., histamine, or certain leukotrienes or prosaglandins) in course of an allergic process.

 *Gaddy v. Four B Corp.,* 953 F.Supp. 331, 338 (D.Kan.) (citing Stedman's Medical Dictionary 158 (26th ed.1995)).

5. Congress enacted the ADA in 1990 to address the inadequacies of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Helen v. DiDario,* 46 F.3d 325, 329 (3rd Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). The definition of "disability" under the ADA mirrors that of the term "handicap" in the Rehabilitation Act of 1973, 29 U.S.C. 701–96, and the two terms have been interpreted identically. *See* 29 C.F.R. Part 1630, App., Interpretive Guidance on Title I of the Americans with Disabilities Act, at 3 ("Congress adopted the definition of [disability] from the Rehabilitation Act ... [and] intended that the relevant caselaw developed under the Rehabilitation Act be generally applicable to the term 'disability' as used in the ADA.").

problems were exacerbated only when she worked in the blood bank, her medical condition did not substantially limit one or more of her life activities. *Id.* In making this determination, the court relied on plaintiff's statement that she felt "fine now that I haven't been in the blood bank for several months" and that after leaving the blood bank, she was able to exercise regularly. *Id.*

■ *Heilweil* leads me to conclude that to qualify as a disability, the "employee's impairment must limit her employment generally." *Heilweil,* 32 F.3d at 719. Furthermore, if a plaintiff's claimed disability disqualifies her from only a narrow range of jobs, then it is not a substantially limiting one. *Id.* at 723. In the present case, plaintiff must show that her asthma substantially limits her ability to breathe, which has the overall effect of restricting her employment opportunities generally. Plaintiff has not met this burden. In her deposition, plaintiff stated that her asthma restricts only her ability to go outside in extreme temperatures, and that either extreme humidity, extreme cold, or strong winds can trigger an asthma attack. (Castro Dep., February 27, 1996, at 130). Even accepting her statements as true, plaintiff's testimony fails to demonstrate that her asthma substantially limits her ability to breathe or that her status as an asthmatic restricted her employment opportunities generally. Plaintiff's job as an organizer required that she spend the bulk of her time engaged in indoor activities such as negotiating contracts, educating union members, and attending various meetings. (*Id.*). In addition, plaintiff's responsibilities under her job title required that she occasionally work outdoors in order to supervise picket lines. (*Id.* at 142). The only accommodation that plaintiff requested when she had to work outdoors in extreme temperatures was a location in which to warm up or cool down periodically for a few minutes at a time. (*Id.* at 144). Thus, for the bulk of her time, plaintiff was not required to work in extreme temperatures and, if the occasion required she do so, she was able to manage. As a result, I find that plaintiff's physical impairment did not substantially limit her ability to breathe, and similarly, her asthma did not limit her employment opportunities

generally; rather, it only restricted plaintiff's work capabilities in the narrowest sense. Far from being inhibited in her ability to work generally, plaintiff's difficulties arose only in regard to a single aspect of a single position. Courts have held that such a minimal limitation does not rise to the level of a disability under the ADA. *See Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383–84 (2d Cir.1996) (stating, in dicta, that plaintiff was not disabled where her back injury only limited her ability to perform a single job within the corporation); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726–27 (5th Cir.1995) (holding that the plaintiff's inability to perform a narrow range of jobs does not qualify her as having an impairment that substantially limits a major life activity); *Gupton v. Virginia,* 14 F.3d 203, 205 (4th Cir.) (commenting that the plaintiff was required to show not just that her impairment incapacitated her for a particular job, but more broadly, for the type of employment involved), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *Byrne v. Board of Educ.,* 979 F.2d 560, 565 (7th Cir.1992) (stating that "[i]t is well established that the inability to perform a particular job for a particular employer is not sufficient to establish a handicap; the impairment must substantially limit employment generally"); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985) (commenting that "[a]n impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one"). Therefore, I find that plaintiff has failed to demonstrate that she is disabled under the ADA, and summary judgment is granted in favor of defendants on this issue.

### III. *ADEA Claim*

In addition to being discriminated against based on her asthma, plaintiff also claims that she was discriminated against because of her age. Plaintiff offers three indications of age discrimination by the defendant union and its agents: a comment made by upper management that she overheard that "young blood" was needed at the union, a union doctor's comment that asthma worsens with

age, and the fact that plaintiff was replaced by a younger individual.

Congress enacted 29 U.S.C. § 621(b) to "promote employment of older persons based on their ability rather than age" and to "prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The New York Human Rights Law embraces similar goals; consequently, the analysis of a plaintiff's age discrimination claim under the New York statute is identical to that under the ADEA. *Ritter v. Medical Arts Center Hosp.*, 1997 WL 45349, at *3, (S.D.N.Y.1997); *Boyle v. McCann–Erickson, Inc.*, 949 F.Supp. 1095, 1099 n. 4 (S.D.N.Y.1997).

A plaintiff alleging discrimination under the ADEA has the burden of showing that her age was a determinative factor in the employment decision. *Boyle*, 949 F.Supp. at 1099. To establish a *prima facie* case under the ADEA, the plaintiff must show that (1) she is in the protected age group, (2) she is qualified for the job, (3) she was discharged, and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *Id.; see also Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir. 1992). If the plaintiff is able to establish a *prima facie* case under the ADEA, the burden then shifts to the defendant to state a legitimate, nondiscriminatory reason for the discharge. *Boyle*, 949 F.Supp. at 1100. If the defendant is able to meet this burden, the burden then shifts back to the plaintiff to show that the employer's reason is a pretext. *Id.*

In the present case, plaintiff is a member of the protected class. *See* 28 U.S.C. § 631(a) (stating that the class consists of individuals who are at least forty years old). Plaintiff also established that she was discharged. Plaintiff has not, however, offered any evidence that she was qualified for the job aside from her own testimony. Furthermore, even if I were to find that plaintiff has showed that she possessed the requisite qualifications for the job, she has not established that her discharge occurred under circumstances giving rise to an inference of age discrimination. The allegedly ageist comments that plaintiff claims were made by the defendants must be scrutinized to determine if they are in fact ageist statements or merely statements indicating something connected to age but not discriminatory. *Id.* at 1101. Courts have found that comments directed at employees such as "old ladies with balls," "young turks," and "it sometimes is difficult to teach an old dog new tricks" were not relevant to the inquiry into whether the employee experienced discrimination based on her age. *Id.; see also Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984); *Getschmann v. James River Paper Co.*, 822 F.Supp. 75, 78 (D.Conn.1993), *aff'd*, 7 F.3d 221 (2d Cir.1993). The comments plaintiff asserts are evidence of age discrimination—upper management's statement that the union needed "young blood" and the union doctor's comment that asthma worsens with age—are of the same magnitude and cannot be considered to be discriminatory. Significantly, the comments were not expressly directed at plaintiff, which she would need to show in order to establish that such remarks were discriminatory. *See Boyle*, 949 F.Supp. at 1102.

Moreover, courts have held that stray remarks in the workplace, by themselves, will not defeat the employer's motion for summary judgment. *See, e.g., Bern v. United Mercantile Agencies*, 942 F.Supp. 217, 220 (S.D.N.Y.1996) (stating that "[e]ven if [the] stray comments could somehow be said to demonstrate some evidence of age bias, they are plainly too immaterial to withstand a properly supported motion for summary judgment").

The only other evidence that plaintiff has adduced on this issue is the fact that she was replaced by a younger individual, a woman in her mid-thirties. The defendants have produced statistical data relating to the ages of employees currently holding the position of organizer in the union: 65% of the staff holding such positions are over the age of forty, the majority of whom are in plaintiff's age range of forty to fifty years old. (Weekes Aff., at 3). Plaintiff does not contest this data. Accordingly, I find that plaintiff has failed to establish a *prima facie* case of age discrimination under either the ADEA or under NYHRL. Defendants' motion for summary judgement is granted as to plain-

tiff's federal and state age discrimination claims.

## IV. Remaining Discrimination Claims

In addition to claiming that she has suffered discrimination because of her asthma and age, plaintiff claims that the defendants discriminated against her based on her race and national origin. Plaintiff alleges that this discrimination escalated upon her return from an extended disability leave in early April, 1994. Plaintiff filed a charge of discrimination with the EEOC in mid-April 1994, and claims that in response, the defendants retaliated against her by denying her the opportunity to exercise the full scope of her responsibilities and ultimately terminating her and subjecting her to a hostile work environment. Plaintiff has failed to come forward with evidence to counter defendants' proffer on summary judgment. Plaintiff's sole evidence on these claims consists of her deposition testimony; plaintiff's testimony conclusively demonstrates, however, that she did not suffer any legally redressable injury.

### A. Hostile Work Environment Pursuant to Title VII

Under Title VII of the Civil Rights Act of 1964[6], an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To state a claim for a hostile work environment under Title VII, the plaintiff must demonstrate that her "workplace is permeated with discriminatory intimidation, ridicule, and insult," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)), so as to "alter the conditions of the victim's employment and create an abusive working environment." *Id.* The inquiry has both objective and subjective components. To satisfy the objective prong of the analysis, the conduct must be offensive or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Id.* Similarly, the victim must actually perceive her employment environment as abusive. *Id.* The determination of whether conduct rises to the level of creating a hostile work environment, and thus violates Title VII, rests upon an examination of the totality of the circumstances. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (1992); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986); *Babcock v. Frank*, 783 F.Supp. 800, 808 (S.D.N.Y.1992); *Galvez v. Means*, 1996 WL 487962, at *2 (S.D.N.Y. 1996).

■ Plaintiff argues that the following incidents created a racially and ethnically hostile work environment. First, plaintiff claims that in December, 1993, a photograph of the plaintiff and Reverend Jesse Jackson was placed in her mailbox at work by an anonymous sender; the words "you are just a white token" appeared scrawled across the picture. Plaintiff, a fair-skinned Hispanic woman, claims that this is evidence of race discrimination. The mere utterance of an epithet which the employee considers offensive, however, is not sufficient to alter the conditions of her employment so as to violate Title VII. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. Second, plaintiff claims that defendant Harris, plaintiff's supervisor, manifested an obvious dislike of Hispanics, as illustrated by Harris's requests that plaintiff refrain from speaking Spanish when non-Spanish speaking employees of the union were present. Such a conclusory allegation of discrimination, however, does not allow a party to defeat summary judgment. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Standing alone, these isolated incidents cannot sustain a claim of discrimination under Title VII. *See Snell*, 782 F.2d at 1102 (stating that a few isolated instances of racial enmity do not give rise to a Title VII violation); *Babcock*, 783 F.Supp. at 808 (finding

---

6. *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), provides that individual defendants—even those with supervisory control—may not be held personally liable for alleged violations of Title VII. *Id.* at 1313. Plaintiff amended her complaint to delete individual defendants from her Title VII claims.

no hostile work environment where the claimed incidents were few in number and occurred over a short period of time); *Picotte v. Community Child Care Center of the Third Ward, Inc.*, 901 F.Supp. 588, 594 (W.D.N.Y.1995) (finding that no hostile work environment existed where the racial comments made were few in number and were not directed at the plaintiff personally); *Lawson v. Getty Terminals Corp.*, 866 F.Supp. 793, 802 (S.D.N.Y.1994) (stating that, although deplorable, the racial epithets aimed at the plaintiff did not give rise to a violation under Title VII because they were isolated remarks); *Bennett v. New York City Dept. of Corrections*, 705 F.Supp. 979, 982 (S.D.N.Y.1989) (indicating that a plaintiff must demonstrate more than a few isolated instances of racial friction in order to sustain a discrimination claim under a hostile environment theory). To sustain a Title VII claim under a hostile work environment theory, plaintiff must present evidence of racially vicious epithets, physically threatening or humiliating actions, or a pattern of such reprehensible behavior over an extended period of time. *Kotcher v. Rosa and Sullivan Appliance Center*, 957 F.2d 59, 63 (2d Cir.1992) (holding that a store manager created a hostile work environment where he pretended to masturbate and ejaculate behind plaintiff's back to express his anger at her, and the conduct took place on a regular basis, and often occurred in front of customers); *Currie v. Kowalewski*, 842 F.Supp. 57 (N.D.N.Y.) (finding a hostile environment where employer subjected plaintiff to continued sexual advances over an eleven month period), *aff'd*, 40 F.3d 1236 (2d Cir.1994); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131–32 (4th Cir.1995) (holding that a Title VII claim was properly sustained where, for six months, plaintiff was subjected to daily "national origin" epithets and name-calling, and was asked to perform objectively impossible tasks); *Gary v. Long*, 59 F.3d 1391, 1397 (D.C.Cir.) (finding that, in a sex harassment case, repeated verbal and physical harass-

ment culminating in rape, was sufficient to state a claim under a hostile work environment theory), *cert. denied*, —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). In the absence of proof of additional instances of such offensive conduct, I find that plaintiff has failed to raise an issue of fact requiring trial on her Title VII claim under the theory of hostile work environment.

## B. Hostile Work Environment Pursuant to N.Y. Exec. Law § 296

Unlike its federal counterpart, section 296 of the New York Executive Law permits a plaintiff to sue an individual defendant in her own personal capacity for creating a hostile work environment in certain circumstances.[7] *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995); *Ritter v. Medical Arts Center Hosp.*, 1997 WL 45349 (S.D.N.Y.). The standard for establishing liability against either the union or the individual defendants under NYHRL is the same as under Title VII. *Id.; see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–15 (2d Cir.1996). Thus, because I have already determined the incidents alleged by the plaintiff were neither so pervasive nor severe to create a hostile work environment under Title VII, summary judgment for the individual defendants on this claim is also granted.

## C. Retaliation under Title VII and N.Y. Exec. Law § 296

Because plaintiff's retaliation claims under Title VII and N.Y. Exec. Law against the defendant union are governed by the same standard, I address them simultaneously. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir.1996) (stating that state law and Title VII claims are considered in tandem "because New York courts rely on federal law when determining claims under" the state human rights law which is covered by N.Y. Exec. Law § 290 *et seq.); Yukoweic v. Intern. Bus. Machines*, 643 N.Y.S.2d 747, 748 n. 1 (3d Dep't), *leave to appeal denied*, 88 N.Y.S.2d 816, 651 N.Y.S.2d 17, 673 N.E.2d

---

7. Section 296(6) of NYHRL states that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296.

Courts have interpreted this language to import liability on individual defendants in their personal capacities under such circumstances. *Tomka*, 66 F.3d at 1317.

1244 (1996) ("New York courts require the same standard of proof in actions brought pursuant to Executive Law § 296 as that applied to federal actions brought under Title VII ...").

To prevail on her retaliation claim, the plaintiff must show that (1) she was engaged in a protected activity under Title VII, (2) that her employer was aware of this activity, (3) that her employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action. *Sumner v. United States Postal Service*, 899 F.2d 203, 208–09 (2d Cir.1990); *Babcock*, 783 F.Supp. at 807. In the present case, plaintiff filed a complaint with the EEOC, which is a protected activity, and it is undisputed that the defendants were aware of the complaint; thus, she has satisfied the first and second elements.

■ Plaintiff has failed, however, to prove the remaining elements necessary to sustain her retaliation claim. With respect to the third element, whether an employer's conduct constitutes an adverse action, the plaintiff must show that the conduct "affected the terms, privileges, duration, or conditions of [her] employment." *Dortz v. City of New York*, 904 F.Supp. 127, 155 (S.D.N.Y. 1995); *Vergara v. Bentsen*, 868 F.Supp. 581, 591 (S.D.N.Y.1994). The conduct plaintiff alleges to constitute adverse employment actions do not satisfy this standard. For example, plaintiff claims that the union "forced" her to walk two-and-a-half miles in the heat to lead an employee demonstration. (Complaint, ¶ 32). Such an activity was part of her job description, however. Thus, because plaintiff's position required that she lead demonstrations in all types of weather, it cannot be said that performing this duty affected the terms, privileges, duration or conditions of her employment. Plaintiff also asserts that the union's refusal to grant her additional sick days over the summer of 1994 was in furtherance of the union's "mission of retaliation" against her. (Complaint, ¶ 43). Because the record establishes that the plaintiff was excessively absent from work, it cannot be said that the union's refusal to

grant the plaintiff additional sick days was unreasonable.

■ The only action that the union took against plaintiff that may be construed as adverse is their decision to terminate her employment when her elected term expired. Even assuming this action was adverse, plaintiff has not demonstrated a causal connection between her dismissal and her filing of her EEOC complaint. A causal connection may be established by showing that the protected activity was closely followed in time by the adverse action. *Reed v. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996). Plaintiff was fired in June, 1995, over a year after she had filed a complaint with the EEOC. Courts have found that a lapse in time of this magnitude is insufficient to establish a causal connection. *See Zenni v. Hard Rock Cafe Int'l Inc.*, 903 F.Supp. 644, 656 (S.D.N.Y.1995) (holding that plaintiff failed to establish a causal connection where "a full year passed between the filing of the charge and the allegation of retaliatory conduct"); *see also Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84–85 (2d Cir. 1990) (holding that plaintiff failed to establish causation where three-and-a-half months passed between the protected activity and the adverse employment action); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir.1991) (holding that plaintiff failed to show retaliation when almost nine months had passed between the protected activity and the adverse employment action), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Therefore, because plaintiff has failed to demonstrate a prima facie case of retaliation, defendants' motion for summary judgment on this issue is granted.

**D. Section 1981 Claim**

■ Section 1981 applies solely to racial discrimination in the making and enforcement of contracts. *See Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (stating that "[a]lthough § 1981 does not itself use the word 'race,' the Court has construed this section to forbid all 'racial' discrimination in the making of private contracts"). In this Circuit, courts have applied the protections

of section 1981 to persons of Puerto Rican or other Hispanic origin. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987); *Hernandez v. New York City Law Dept. Corp. Counsel*, 1997 WL 27047 (S.D.N.Y.); *Cruz v. Ecolab Pest Elimination Div., Ecolab Inc.*, 817 F.Supp. 388 (S.D.N.Y.1993).

■ To establish a claim under section 1981, the plaintiff must demonstrate (1) that she is a member of a racial minority, (2) an intent to discriminate on the basis of race by the defendant, and (3) that the discrimination interfered with one of the activities enumerated in § 1981, which includes her ability to make and enforce contracts.[8] *Mian v. Donaldson*, 7 F.3d 1085, 1087 (2d Cir.1993), *aff'd*, 60 F.3d 810 (2d. Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). Plaintiff has sufficiently demonstrated the first element; she is undisputedly of Puerto Rican origin. Plaintiff has failed, however, to satisfy the second element, as she has not demonstrated that the defendants' decision to terminate her was intentionally discriminatory. Defendants have produced extensive evidence proving that plaintiff's termination came about because she was excessively absent, unreliable, and insubordinate. Because plaintiff has failed to come forward with any evidence to rebut defendants' myriad of legitimate reasons for firing her, I find that plaintiff has failed to proffer evidence from which a factfinder could infer that her dismissal was based on the defendants' discrimination against her because of her race. Defendants' motion for summary judgment is granted as to plaintiff's section 1981 claims.

## E. State Law Claims

In addition to her federal and state statutory claims, plaintiff has brought a variety of state common law causes of action. Some of these claims address alleged wrongdoing by all the defendants while other claims are directed solely at a particular defendant. As discussed in more detail below, each of plaintiff's claims under New York state common law suffers from a substantive fatal flaw.

### 1. Breach of Contract

Plaintiff argues that by failing to follow its antidiscriminatory policy contained in its employee manual and Constitution, the union breached its contractual obligation to plaintiff. Plaintiff's claim in this regard is clearly deficient.

■ In the State of New York, in the absence of an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will. *De Petris v. Union Settlement Assoc., Inc.*, 86 N.Y.2d 406, 633 N.Y.S.2d 274, 276, 657 N.E.2d 269, 271 (1995); *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 195–96, 443 N.E.2d 441 (1982); *Tucker v. Battery Park City Parks Corp.*, 642 N.Y.S.2d 891, 892 (1996); *Kelley v. New York State Martin Luther King Jr. Commission and Inst. for Nonviolence*, 229 A.D.2d 629, ——, 644 N.Y.S.2d 862, 863 (1996) (noting that it is "well-settled that ... an employment relationship is presumed to be a hiring at will...."). Either party in an at-will employment relationship may terminate the relationship at any time. *De Petris*, 633 N.Y.S.2d at 276, 657 N.E.2d at 271. Moreover, New York law does not recognize a tort of wrongful discharge or require good faith in an at-will employment relationship. *Id.* The at-will presumption may be rebutted, however, if the employee is able to show two things: (1) that the employer made the employee aware of an express written policy limiting its right of discharge, and (2) that the employee detrimentally relied on that policy in accepting the employment. *Id.* The New York Court of Appeals has indicated that the "[m]ere existence of a written policy ... does not limit an employer's right to discharge an at-will employee, or give rise to a legally enforceable claim by the employee against the employer." *De Petris*, 633 N.Y.S.2d at 276, 657 N.E.2d at 271.

■ Plaintiff has failed to satisfy either of these criteria. First, plaintiff concedes that the personnel manual was not distribut-

---

**8.** Section 1981 protects the rights of individuals to "make and enforce contracts, to sue, be parties, give evidence, and to [enjoy] the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981.

ed to employees until 1989–90, and that once she received a copy, she automatically put it in her drawer at work without looking at it. (Castro Dep., February 26, 1996, at 214–15). Therefore, plaintiff could not have relied on the policies enumerated in a document that did not exist at the time she accepted employment with the union. Moreover, by admitting that she had not read any provisions of the manual until her supervisors began "picking on" her, plaintiff indicates that she in no way detrimentally relied on the employment manual. (Castro Dep., February 26, 1996, at 215).

■■■■ The union constitution that took effect the year before plaintiff began to work for the union does not create an employment contract. *Doyle v. Turner,* 1993 WL 183788, at *3 (S.D.N.Y.). The constitution governs the relationship between members of the union and the union rather than the union's relationship with its employees. (Defendant's Exhibit A; Local 1199 constitution). Thus, where the claims focus exclusively on the employer-employee relationship, the union is merely a regular employer with the same rights and privileges as any other employer. *Doyle,* at *3. The union constitution, therefore, serves plaintiff neither as a sword nor a shield. *Id.*

Even if I were to find that the constitution created a contract, plaintiff's claim would fail. Plaintiff's core contention on this issue is that the union president may not terminate an elected organizer. (Defendant's Exhibit A). The unrebutted evidence shows, however, that the union fired the plaintiff after her elected term expired. Therefore, even if the union constitution comprised a contractual obligation, no breach of that obligation occurred. Defendants' motion for summary judgment is granted as to plaintiff's breach of contract claim.

### 2. Fraud Claim

■■■■ Plaintiff's fraud claim arises out of events surrounding a union election. Plaintiff claims that defendants lied about the results of the election in order to prevent her from retaining her elected position with the union.

To establish a claim for fraud under New York law, the plaintiff must demonstrate the following elements: (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff with such representation, (3) that the plaintiff reasonably relied on the representation, and (4) that the plaintiff suffered damage as a result of such reliance. *Keywell Corp. v. Weinstein,* 33 F.3d 159, 163 (2d Cir.1994). The facts elicited in the course of plaintiff's testimony, even if presumed true, do not state a claim for fraud. Plaintiff has not shown that she relied on the "false" election results to her detriment. Furthermore, plaintiff has not produced any evidence beyond her own assertions to support her claim that a misrepresentation was in fact made to rebut the convincing evidence offered by the defendants that the election results were legitimate. (Harris Aff., at 13–15).

### 3. Assault Claim Against Individual Defendant Steve Frankel

■■■■ Plaintiff's assault claim against Frankel arises out of events that allegedly took place at a routine meeting on Friday, April 8, 1994. (Castro Dep., August 7, 1995, at 76). Those attending the meeting were defendant Frankel, plaintiff's supervisor, Patricia Harris, and four other union employees. (*Id.* at 78). Plaintiff had returned from an extended disability leave that Monday and had not received her usual assignment. (*Id.*). When plaintiff questioned Harris about this matter at the meeting, Harris was unresponsive. (*Id.*). Harris then assigned plaintiff to assist another organizer in preparing for an arbitration, an assignment which plaintiff found to be unsatisfactory. (*Id.* at 80). Plaintiff became upset at this point and pleaded with her supervisor to "level" with her and tell her "what the hell was going on." (*Id.*).

At this point, plaintiff claims that Steve Frankel, screamed, "You know something, if I was you, I would take whatever assignment they give me and that's it." (*Id.* at 81–82). When plaintiff asked Frankel what he meant, Frankel slammed his hand on the table again and responded, "If I was you, I would take whatever they give me, because you could

lose more than your job." (*Id.* at 82). Plaintiff claims that Frankel was visibly angry during the course of the exchange as he was "red in the face," slamming the table, and "coming at" her by wheeling his chair closer and closer to her. (*Id.* at 82–83, 93, 115). Plaintiff implored Frankel to clarify his statement by asking, "What do you mean I could lose more than my job? Are you threatening my life?" (*Id.*). Frankel then stated, "Take it any way you want." Plaintiff gathered her things and stated, "Well, it seems, Pat, you're not going to give me an assignment. It seems I am amongst enemies here," and left the meeting. (*Id.* at 82–83).

 Under New York law, assault is the intentional placing of another person in apprehension of imminent harmful or offensive contact. *United National Ins., Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 108 (2d Cir.1993); *Cohen v. Davis*, 926 F.Supp. 399, 402 (S.D.N.Y.1996); *Hayes v. Schultz*, 150 A.D.2d 522, 541 N.Y.S.2d 115, 116 (2d Dep't 1989). With respect to verbal threats, "words not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault." *Williams v. Port Authority of New York and New Jersey*, 880 F.Supp. 980, 994 (E.D.N.Y. 1995). The facts of Williams are similar to the present case. In *Williams*, the plaintiff, an employee of defendant Port Authority, was called into his supervisor's office where his supervisor reprimanded him. *Id.* Once inside the office, the plaintiff claimed that the supervisor used a racial slur, backed him against the wall, and threatened to "get him." *Id.* The Williams court dismissed the complaint finding that no assault occurred because the supervisor's threat was "forward-looking," and not of such nature as to lead the plaintiff to believe that his supervisor was going to strike him at or near that point in time. *Id.*

Similarly, in the present case, the actions that plaintiff asserts constitute an assault—plaintiff's interpretation of Frankel's remarks

as a threat, Frankel "slamming" the table with his hand and moving his chair closer to plaintiff during the course of the exchange—were "forward-looking" and were not accompanied by gestures that would cause plaintiff to reasonably believe that she was in danger of imminent bodily harm. Furthermore, plaintiff's own admission indicates that her apprehension of bodily harm was not imminent.[9] Accordingly, defendant Frankel's motion for summary judgment is granted as to plaintiff's assault claim.

### 4. Intentional Infliction of Emotional Distress Claim

Under New York law, in order to establish a claim for the tort of intentional infliction of emotional distress, a plaintiff must demonstrate four elements: (1) that the defendant engaged in extreme and outrageous conduct, (2) that the defendant intended to cause severe emotional distress, (3) that the plaintiff suffered severe emotional distress, and (4) that the defendant's conduct caused the plaintiff severe emotional distress. *Bender v. New York*, 78 F.3d 787, 790 (2d Cir.1996); *Ward v. Goldman Sachs & Co.*, 1996 WL 3930 (S.D.N.Y.1996); *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). New York courts have imposed a very high threshold for intentional infliction of emotional distress claims, requiring that "the conduct must be so outrageous and extreme as to go beyond all possible [b]ounds of decency." *Bender*, 78 F.3d at 790; *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978). For example, a New York appellate court found that, in a case of alleged employee harassment, the allegation of a "hard slap on [plaintiff's] backside" during an outburst of rage by the individual defendant, although meeting the criteria necessary to sustain a claim of assault and battery, fell short of the rigorous standard of outrageous conduct necessary to maintain a cause of action for intentional infliction of emotional distress. *See Jaffe v. National League for Nursing*, 222

---

**9.** In her deposition, plaintiff stated, "Let me tell you, with some things you read about unions, that's how I felt. I thought this man was going to kill me or send somebody out there to kill me." (Castro Dep., August 7, 1995, at 92–93).

A.D.2d 233, 635 N.Y.S.2d 9, 9 (1st Dep't 1995).

In the present case, I find that the conduct alleged by the plaintiff does not rise to the level of being "so outrageous and extreme as to go beyond all possible [b]ounds of decency." *Fischer*, 43 N.Y.2d at 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215. Rather, the conduct in question appears to be exemplary of typical heated discussions that take place, by plaintiff's own account, during such meetings. (Castro Dep., August 7, 1995, at 93.) Accordingly, defendants' motion for summary judgment on this claim is granted.

Thus, each of plaintiff's common law claims suffers from a fatal defect. To the extent plaintiff has any remaining claims beyond those analyzed above, I decline to exercise pendent jurisdiction over such claims in the absence of a valid federal claim.

## CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment are granted in their entirety. The Clerk of the Court shall mark this action "closed."

SO ORDERED.