Dimitra TANGIRES, Plaintiff,

v.

THE JOHNS HOPKINS HOSPITAL, Defendant.

No. CIV.H–98–4181.

United States District Court, D. Maryland.

Jan. 10, 2000.

Christina Guereola Sarchio and Beveridge & Diamond, Washington, DC, for plaintiff.

Elizabeth G. Jacobs and Serotte, Rockman & Wescott, Towson, MD, for defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY II, Senior District Judge.

Plaintiff Dimitra Tangires ("Tangires") was employed by defendant The Johns Hopkins Hospital (the "Hospital") from December 1984 until February 1993. She has filed a civil action in this Court against her former employer seeking relief under the Americans With Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 791, *et seq.*

In Count I of her complaint, plaintiff Tangires alleges that defendant denied her requests for accommodation, in violation of provisions of the ADA and the Rehabilitation Act. Count II alleges that the Hospital, because of plaintiff's disability, failed to promote her or assign preferred work projects to her despite her qualifications and favorable evaluations, in violation of provisions of the ADA and the Rehabilitation Act. In Count III, it is alleged that defendant terminated plaintiff's employment and discriminated against her because of her known disability, in violation of provisions of the ADA and the Rehabilitation Act. Compensatory and punitive damages, including back pay and front pay, as well as declaratory and other relief are here sought by the plaintiff.

Pursuant to a Scheduling Order entered by the Court, the parties have engaged in extensive discovery. Presently pending before the Court are defendant's motion for summary judgment and defendant's motion to exclude the testimony of plaintiff's expert witnesses. The parties have submitted memoranda, affidavits, exhibits and excerpts from depositions in support of and in opposition to the pending motions. A hearing on the motions has been held in open court. For the reasons stated herein, the Court has concluded that defendant's motion for summary judgment must be granted. Since summary judgment will be entered in this case in favor of defendant as to all three counts of the complaint, it is not necessary for the Court to address defendant's motion to exclude the testimony of plaintiff's expert witnesses.

### I

#### Background Facts [1]

Tangires was born in 1955 and has suffered from asthma since childhood. Her asthma became dormant during her teen years, but a recurrence was triggered as the result of Tangires having undergone a Contrast–Enhanced Computer Tomography ("CT") Scan in 1980. This CT Scan revealed that plaintiff had a pituitary adenoma, a type of tumor, which required treatment and medication. Since having had the CT Scan, Tangires has suffered from asthma and from her pituitary adenoma.

In December 1984, Tangires was hired by the Hospital as an Interior Design Coordinator in the Facilities, Design and

---

**1.** The facts and all reasonable inferences will be viewed in the light most favorable to plaintiff Tangires, as the party opposing defendant's motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

Construction Department ("the Facilities Department"). Tangires' duties included the planning, design and preparation of interior design projects at the Hospital. Tangires was the only employee at the Hospital employed exclusively as an interior designer. At the commencement of her employment with the Hospital, Tangires notified her employer that she suffered from asthma and other related ailments.

In 1990, all employees in the Facilities Department were reorganized into project teams, and Tangires was assigned to work on a project team headed by Project Manager Bridget Hutchinson ("Hutchinson"). In March 1991, Tangires' position as Interior Design Coordinator was reclassified and renamed "Senior Interior Designer."

From 1985 through 1991, Tangires worked in an office in the Houck Building at the Hospital. In December 1991, Tangires was relocated to a different office within the Houck Building. The purpose of this move was to allow for the placement of members of the new project teams in offices close in proximity to one another. The air flowing into Tangires' new office from the air handling unit (the "air system") was much cooler and forceful than it had been in her previous office. According to Tangires, the temperature and velocity of the air flow in Tangires' new office aggravated her asthma.

During the office move, Hutchinson had been on vacation. Upon her return in January, 1992, Tangires complained to Hutchinson that she and a co-worker found the air system in the new office to be a "hardship" and that it was making them feel "cold" and "sick." However, Tangires did not specifically request that she needed the air system fixed in order to accommodate complications arising as a result of her asthmatic condition. Hutchinson responded to Tangires by telling her that the project team could not switch offices, that a great deal of money had been spent on the move, and that Tangires and her co-workers would just "have to live with [the conditions]." Hutchinson did

agree to contact the maintenance department at the Hospital to see if the problem could be fixed. Soon thereafter, Hutchinson contacted Geoff Haley, a maintenance person, with whom she set up a meeting. However, no action was taken to correct the problem. Before Hutchinson's return, Tangires had herself also contacted maintenance personnel about the air system problems. At least two maintenance persons came to Tangires' office, but the air system problem nevertheless still continued unabated.

Tangeris also spoke with Arnie Anderson ("Anderson"), another project manager at the Hospital, and complained to him about the problems with the air system in her office. She told Anderson that the air system made her office feel very cold and was causing her to be sick, but she did not specifically mention to him that the problem worsened her asthmatic condition. In an attempt to correct the problem, Anderson placed a metal rod in the air shaft in Tangires' office to reduce the air flow into the office. However, when Michael Iati ("Iati"), the Design Manager at the Hospital, learned of Anderson's actions, Anderson was instructed by Iati to remove the rod because it could cause problems with the heating, ventilation and cooling system in other areas of the building. During this period, Tangires never expressed to Iati her concerns about the air system. Tangires did discuss her air system problems with Alfred Hanna ("Hanna"), the Employee Relations Supervisor of the Hospital.

Beginning in April 1992, Tangires took a medical leave of absence due to complications arising from her asthma and from other medical conditions, including her pituitary adenoma. Her request for medical leave was submitted in early June 1992 and was formally granted by Iati on June 29, 1992, some two months after her absence from the Hospital began.

Tangires returned to work on September 14, 1992. Upon her return, she was

seen by the Hospital's Occupational Health Services Department (the "Occupational Department") and was cleared for return to duty without any needed accommodation. Tangires' lack of need for any accommodation was confirmed by her physician's office and by conversations between personnel of the Occupational Department and Tangires herself. Tangires had a discussion with Fran Humphries of the Occupational Department regarding her concerns about "getting the flu" and "what to do with regards to sick time." However, Tangires did not at this time request any accommodation for her asthma.

In November 1992, Tangires met with Iati to discuss a pay raise, her desire to do interior design work on the Hospital's Cancer Center facility (the "Cancer Center Project"), and the possibility of creating a new position at the Hospital for Tangires, namely as Director of Interior Design. Assigning Tangires to work on the Cancer Center project would not have been a promotion for Tangires because her pay grade, her salary and her job title would not have changed. Iati indicated that he would consider her requests, but he ultimately took no action concerning them.

During this same time period, Tangires also spoke with John Baldwin ("Baldwin"), one of her supervisors, about her desire to work on the Cancer Center Project. Soon thereafter, Tangires discovered that another employee, Susan Klotz, had been assigned to work on the Cancer Center Project.

In December 1992, Tangires and a co-worker in the office next to Tangires, Suzi Morris ("Morris"), had a disagreement over the thermostat which controlled the temperature and air velocity in both offices. Morris felt that she needed the thermostat to be at a particular setting in order to prevent the air flowing into her office from blowing forcefully and loudly. However, Tangires took the position that she needed the thermostat to be at a different setting from that desired by Morris in order to maintain the air velocity and temperature in her own office at acceptable levels. In January 1993, Tangires met with Baldwin regarding this disagreement and complained of the effect of the air system on her asthma. Baldwin told her that the situation was not of his concern. Baldwin also gave Tangires a verbal warning regarding her behavior and her reaction to the situation with Morris.

On January 20, 1993, Tangires was hospitalized for a bronchial infection, an asthma attack, a collapsed lung, and for other respiratory-related ailments. The recurrence of Tangires' asthma was triggered when, in late December of 1992, she was exposed to fumes from a broken furnace at the home of her parents. On February 2, 1993, Tangires contacted Peggy Mooney ("Mooney") of the Hospital's Occupational Department and informed her that she had acute asthmatic bronchitis. During this same period, Tangires and Baldwin had a conversation during which Baldwin informed her that, if she was again absent from work for an extended period, he might have to place her on a medical layoff.

The Hospital's "Medical Layoff" policy provides, in relevant part, as follows:

A medical layoff may be granted to any employee who applies for a leave of absence for medical reasons, . . . but cannot be granted such leave because of a business necessity. In this context medical layoff may be considered for those employees no longer able to perform their job assignment in a satisfactory manner because of medical restrictions or limitations.

On February 10, 1993, plaintiff's physician requested that the Hospital grant Tangires a medical leave of absence, retroactive to February 1, 1993 and through March 15, 1993. Mooney completed and submitted a Leave of Absence Request Form on behalf of Tangires. On February 11, 1993, management of the Hospital denied Tangires' request and instead placed her on a medical layoff. Baldwin informed

Tangires of the decision that same day. This decision allowed the Hospital to fill Tangires' position during her absence while also permitting her to retain bidding rights on vacant positions at the Hospital for one year without losing her seniority. During her conversation with Baldwin, Tangires did not discuss with him any accommodation which she was then seeking to help address her aggravated asthmatic condition, other than her request that she be given a medical leave of absence.

On February 24, 1993, Tangires filed an internal grievance with the Hospital, alleging disability discrimination for having been placed on a medical layoff, for the Hospital's failure to provide reasonable accommodations for her disability, and for its failure to promote her. Tangires met with Baldwin, Iati, and Hanna concerning her grievance. On March 22, 1993, Baldwin informed Tangires that her internal grievance had been denied. Tangires then appealed that decision to a fact finding committee of the Hospital. In January 1994, Tangires was informed by James Block, President of the Hospital, that her internal appeal had been denied.

On March 3, 1993, Tangires had filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), claiming that the Hospital had violated the ADA.[2] On December 12, 1993, Tangires amended her Charge.[3] On September 28, 1998, the EEOC sent Tangires a "Right to Sue" letter. On December 23, 1998, Tangires filed this civil action in this Court.

**2.** Tangires' original EEOC Charge alleged that, in violation of the ADA, she had been: (1) denied reasonable accommodations regarding her disability in December 1991, January 1992, August 1992 and January 1993; (2) disciplined because of her disability; and (3) discharged because of her disability which was exacerbated by the denial of reasonable accommodations.

## II

### *Summary Judgment Principles*

It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claims alleged. *See* F.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 106 S.Ct. 2548.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), "when the moving party has

**3.** In her amended EEOC Charge, Tangires alleged that in addition to her previous allegations, she had also, under provisions of Title VII of the Civil Rights Act of 1964 been: (1) subjected to a hostile work environment due to a coworkers sexual relationship with a supervisor; (2) demoted because of sexual favoritism of management granted to a female co-worker; and (3) denied a promotion because of this same sexual favoritism.

carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'" *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted.

### III

#### *Applicable Law*

The ADA makes it unlawful for an employer to:

discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Examples of discrimination within the meaning of the ADA include, *inter alia:*

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; . . .

(5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant . . .

42 U.S.C. § 12112(b).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2).

■ To establish a claim under the ADA for discrimination based on the denial of reasonable accommodations, a plaintiff must demonstrate that: "(1)she is an 'otherwise qualified individual with a disability,' i.e., able to perform the essential

functions of the job in question with or without reasonable accommodation; and (2) if a reasonable accommodation is necessary, that the denial of the accommodation was made in a discriminatory fashion." *Bryant v. Better Business Bureau of Greater Maryland*, 923 F.Supp. 720, 733 (D.Md.1996) (Davis, J.) (citing *Myers v. Hose*, 50 F.3d 278, 281–82 (4th Cir.1995)). These determinations are to be made by the Court on a "case-by-case" basis. *Id.*

In the absence of direct evidence of discriminatory denial of reasonable accommodations by a defendant, a plaintiff, in order to prevail on an ADA claim, must satisfy the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 196 (4th Cir.1997). First, a plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of disability discrimination. *Id.* at 197. This initial burden may be satisfied by the production of evidence establishing that such plaintiff was a "qualified individual with a disability" and that the denial of the requested accommodation raised a reasonable inference of discrimination. Once this initial requirement is met, the burden shifts to the defendant to "rebut the presumption of discrimination by producing evidence that the plaintiff was [denied accommodation] ... for a legitimate, nondiscriminatory reason." *Id.* (citation omitted). If the defendant meets its burden of production, the presumption raised by the *prima facie* case is rebutted and "drops from the case," and the plaintiff then bears the ultimate burden of proving that he or she has been the victim of intentional discrimination. *Id.* (citations omitted).

■ For a plaintiff to make a *prima facie* case of disability discrimination for failure to promote or for termination of employment, such plaintiff must show: (1)

that he or she is protected under the ADA; (2) that he or she was classified on the basis of disability and suffered a job detriment; (3) that his or her job performance at the time of the adverse employment action met the legitimate expectations of the employer; and (4) that the circumstances surrounding the adverse employment action give rise to a reasonable inference of unlawful discrimination. *Ennis v. Nat'l Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995); *Shiflett v. GE Fanuc Automation Corp.*, 960 F.Supp. 1022, 1032 (W.D.Va.1997). The *McDonnell–Douglas* proof scheme is fully applicable to the discrimination analysis in these contexts. *Id.*

## IV

### *Proof of Disability*

Insofar as each of plaintiff's ADA claims are concerned, plaintiff has the burden of first proving by a preponderance of the evidence that defendant discriminated against her because of her disability. Plaintiff has alleged that, at the time of the matters in suit, she suffered from asthma and that she was substantially limited in her major life activity of breathing. To prove that she had a "disability" as defined by the ADA, plaintiff must establish: (1) that her asthma is a "physical or mental impairment"; and (2) that her asthma "substantially limits" the major life activity of breathing. 42 U.S.C. § 12102(2). Defendant contends that, under the circumstances here, plaintiff's asthma did not constitute a physical impairment within the meaning of the ADA and did not substantially limit her breathing.

As noted, the determination of whether a particular impairment constitutes a disability must be made on a case-by-case basis. *Bryant*, 923 F.Supp. at 733. The requirement in an ADA case that an indi-

---

4. There is no need to separately consider the claims asserted by plaintiff under the Rehabilitation Act. The ADA and the Rehabilitation Act are generally construed to impose the same requirements due to the similarity of the language of the two acts. *Rogers v. Department of Health, Environmental Control*, 174 F.3d 431, 433–34 (4th Cir.1999).

vidualized analysis should be made is particularly appropriate in the context of a disability claim based on asthma. *Castro v. Local 1199, National Health and Human Services Employees Union,* 964 F.Supp. 719, 723 (S.D.N.Y.1997). The severity of asthma varies a great deal from person to person, and the frequency with which a person experiences asthmatic episodes also varies greatly. *United States v. Sherman,* 53 F.3d 782, 787 (7th Cir.1995). With proper treatment, asthmatic symptoms can almost always be controlled. *Id.; Castro,* 964 F.Supp. at 723.[5]

■ Very recently, the Supreme Court has held that the determination of whether a person has a disability within the meaning of the ADA must be made with reference to corrective mitigating measures, including medication. *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). In *Sutton,* the plaintiffs had severe myopia but had 20/20 vision when they wore glasses. In concluding that plaintiffs were not disabled under the ADA because they could not show that they were substantially limited in any major life activity, the Supreme Court concluded that:

> A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity.

*Sutton,* 527 U.S. at ——, 119 S.Ct. at 2146.

A similar result was reached in *Murphy* wherein the Supreme Court concluded that the plaintiff was not disabled within the meaning of the ADA because his hypertension did not substantially limit him in any major life activity when he was medicated.

As the Court noted in both *Sutton* and *Murphy,* the determination of a plaintiff's disability must be made with reference to the mitigating measures which the plaintiff employs. *Murphy,* 527 U.S. at ——, 119 S.Ct. at 2137.

■ Medical evidence in this case establishes that asthma is readily treatable by two different kinds of medications. According to Dr. John Eppler, one of plaintiff's treating physicians,[6] asthma is an illness which can be completely controlled with medication. Broncodialators are prescribed to cause the opening of the airways and increased airflow. Anti-inflammatory medications, in particular corticosteroids, are used both by inhalation and systemically to decrease inflammation of the airways. Although plaintiff did from time to time use an albuterol inhaler and did thereby obtain relief from her breathing difficulty, she was resistant to the use of inhaled steroids. Dr. Eppler testified at his deposition that he had a difficult time treating plaintiff's asthma because of her reluctance to take steroid drugs and her refusal to comply with his recommendations. According to Dr. Eppler, plaintiff's asthma was slow to clear because he was limited in the medications that she would agree to take. Difficulties in controlling plaintiff's asthma also arose because plaintiff persistently fragmented her medical care by seeking treatment from so many different doctors and in various emergency rooms of different hospitals.

Medical records relating to the treatment of plaintiff's asthma disclose many refusals on her part to take medications and to follow doctors' instructions for the treatment of her conditions. In September, 1983, plaintiff had been treated by Dr. Thomas Pozefsky. According to Dr. Po-

---

**5.** Many courts, addressing the issue, have found that asthma does not substantially limit the ability of the particular plaintiff to work or breathe and that asthma therefore does not constitute a disability under the ADA. *Castro,* 964 F.Supp. at 724, (citing *Ventura v. City of Independence,* 1997 WL 94688, 108 F.3d 1378

(6th Cir.1997); *Gaddy v. Four B Corp.,* 953 F.Supp. 331, 331–32, 337–38 (D.Kan.1997); *Emery v. Caravan of Dreams,* 879 F.Supp. 640, 642 (N.D.Tex.1995)).

**6.** Dr. Eppler treated plaintiff between May of 1992 and October of 1993.

zefsky, plaintiff "adamantly" refused Proventil or Theo–Dur as recommended by him. Dr. John Bacon, who treated plaintiff commencing in March 1993, testified at his deposition that steroids are the "gold standard" for the treatment of asthma. According to Dr. Bacon, plaintiff's asthma would have been better controlled had she taken inhaled steroids as prescribed by her physicians.

Plaintiff's persistent refusal to use inhaled steroids to treat her asthma was based on her subjective and unsubstantiated belief that such use would adversely affect her pituitary adenoma. According to Dr. Eppler, when he treated her in May of 1992 and counseled her about the advantages of using anti-inflammatory medicine for her asthma, she "almost went into a panic and developed very childish behavior." There is no medical evidence in the record here indicating that steroids should not be taken by a person who is being treated for a pituitary tumor. The record here indicates that plaintiff's treating doctors apparently disagreed with her belief that steroids should not be taken by a person who had a pituitary adenoma. All of them knew of plaintiff's pituitary adenoma, but they nevertheless prescribed inhaled steroids for the treatment of her asthma. After her employment with defendant had been terminated, plaintiff did take steroid medication and her asthma did improve.

On the record here, this Court concludes that plaintiff's asthma was treatable and that during her employment she intentionally failed to follow her physicians' recommendations that she take steroid medication. Since plaintiff's asthma is correctable by medication and since she voluntarily refused the recommended medication, her asthma did not substantially limit her in any major life activity. A plaintiff who does not avail herself of proper treatment is not a "qualified individual" under the ADA. *Roberts v. County of Fairfax, Va.*, 937 F.Supp. 541, 549 (E.D.Va.1996). Since plaintiff has not on the record here presented proof that she has a disability as defined in the ADA, defendant is entitled to the entry of summary judgment in its favor as to all three counts of the complaint.[7]

V

*Count I—Reasonable Accommodations*

Even if plaintiff were able to prove that she suffered from a disability, she would not in any event on the record here be permitted to proceed to trial on the claim asserted by her in Count I. Plaintiff has alleged that she requested reasonable accommodations on the following four separate occasions: December 1991, January 1992, September 1992 and January 1993.[8]

As in cases brought under Title VII of the Civil Rights Act of 1964, a plaintiff bringing a discrimination action under the ADA is required to first timely file a charge of discrimination with the EEOC before commencing suit in federal court. *Lipscomb v. Clearmont Construction & Development Co., Inc.*, 930 F.Supp. 1105, 1105 (D.Md.1995). The charge must be filed with the EEOC within 180 days of the alleged unlawful employment practice, unless within that period the claimant had initially instituted proceedings with a state or local agency, in which event the charge must be filed with the EEOC within 300 days. *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir.1994).

---

7. Relying on *Rhoads v. Federal Deposit Insurance Corp.*, 956 F.Supp. 1239, 1246 (D.Md. 1997), defendant has also argued that plaintiff has not shown that her ability to work is substantially limited by the effect which her asthma has on her major life activity of breathing. In view of the Court's determination that plaintiff has not established that she has a disability within the meaning of the ADA, it is not necessary for the Court to address this alternative argument.

8. The Court has herein addressed only those four occasions because they were the only ones relied on by plaintiff in the amended charge which she filed with the EEOC.

On March 3, 1993, plaintiff filed a charge of discrimination with the EEOC. Defendant argues that plaintiff is precluded from litigating any allegedly discriminatory act which occurred more than 180 days prior to the filing of her charge, thus barring this Court's consideration of plaintiff's requests for reasonable accommodation which were allegedly made in December, 1991 and January, 1992. This Court would agree.

 Timeliness requirements for an action alleging employment discrimination are to be strictly enforced. *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). Discriminatory acts which fall outside the statutory window are time barred from consideration in federal court, unless they can be related to a timely incident as a series of separate but related acts. *Beall v. Abbott Labs.,* 130 F.3d 614, 620 (4th Cir.1997). Plaintiff argues that her claims based on the December, 1991 and January, 1992 acts of defendant are not barred by limitations because they are part of "a continuing violation." *Redding v. Anne Arundel County, Md.,* 996 F.Supp. 488, 490 (D.Md.1998). However, the evidence here does not indicate that defendant's allegedly wrongful conduct constituted "systemic" discriminatory violations. Rather, the incidents relied upon by plaintiff were at most "serial violations" which were not shown by plaintiff to have been composed of a series of discriminatory acts deriving from "the same discriminatory animus." *Id.* Accordingly, each incident constituted a separate wrong actionable under federal law. As separate "serial violations," the denials of accommodation which allegedly occurred in December, 1991 and January, 1992 fall outside of the 180 day statutory window for the filing by plaintiff of an EEOC charge. These two claims are accordingly barred.

Plaintiff's claims that she was denied reasonable accommodations in September, 1992 and January, 1993 will be addressed on the merits. Assuming that plaintiff were able to prove that she is a qualified individual with a disability, she would still be required to produce evidence establishing that defendant's denials of reasonable accommodations in September, 1992 and in January, 1993 were made in a discriminatory fashion. *Bryant,* 923 F.Supp. at 733.

 The plaintiff in an ADA suit bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation. *Tyndall v. National Educational Centers, Incorporated,* 31 F.3d 209, 213 (4th Cir. 1994). An employee is precluded from bringing suit under the ADA for failure to accommodate if such employee has failed to inform the employer of his or her need for a specific accommodation. *Beck v. Wisconsin,* 75 F.3d 1130, 1134 (7th Cir. 1996); *Shiflett,* 960 F.Supp. at 1034.

Evidence does not exist in the record here that plaintiff requested a specific accommodation for her asthma in September of 1992. There were discussions in that month between plaintiff and Fran Humphries concerning plaintiff's health. According to plaintiff's deposition testimony, she merely informed Humphries at that time of her concerns about "getting the flu" and "what to do with regards to sick time." Plaintiff had returned to work in September, 1992 after a five month medical leave of absence. Upon her return, correspondence and conversations between her physician and defendant's Occupational Department confirmed that she had been cleared to return to work without any needed accommodations. Since evidence does not exist that plaintiff in September, 1992 informed her employer of her need for a specific accommodation, plaintiff may not proceed to trial based on the alleged denial of accommodation occurring in September, 1992. *See Beck,* 75 F.3d at 1134; *Shiflett,* 960 F.Supp. at 1034.

Nor is plaintiff Tangires entitled on the record here to present to the jury the claim asserted by her in Count I that she was denied reasonable accommodation in

January of 1993. Even assuming, *arguendo*, that the Court were to find on this record that plaintiff had made out a *prima facie* case under the ADA of discrimination, summary judgment in favor of the defendant would still be granted as to the January, 1993 occurrence. Defendant has in this case articulated legitimate, non-discriminatory reasons for failing to alter the air system in plaintiff's office in January, 1993. In that month, plaintiff had a dispute with one of her co-workers over the thermostat which controlled the temperature and flow of air into the office. When she informed John Baldwin, her supervisor, of her asthmatic condition and of her need for accommodation in the office, he denied the request. Baldwin told plaintiff that his concern was that she get along with people and get her work done. The manner in which Baldwin resolved the conflict between plaintiff and her co-worker was a legitimate, non-discriminatory reason for failing to make changes in the air system.

On the record here, this Court concludes that plaintiff has failed to meet her burden under *McDonnell Douglas* of demonstrating that the reason given by Baldwin was pretextual and that the actual reason for denying her request was plaintiff's disability. *Halperin*, 128 F.3d at 197. Evidence of discriminatory motive on the part of defendant does not exist in this record. Plaintiff has failed to come forward with evidence " 'of a stated purpose to discriminate of sufficient probative force to reflect a genuine issue of material fact.' " *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (*quoting Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988)).

Plaintiff argues that evidence of discrimination exists because defendant fixed the air system of Midge Weber following her complaints but did not make changes in the air system in plaintiff's office after plaintiff's complaints. However, the alteration requested by Weber involved merely adding a diffuser to the air system in her office. A diffuser was already a part of the air system in plaintiff's office, and Weber merely obtained what plaintiff already had. The fact that defendant agreed to alter Weber's air system does not under the circumstances constitute evidence of discrimination.

In claiming that evidence of discriminatory intent exists in this record, plaintiff relies essentially on her own conclusory statements to such effect. However, in opposing defendant's motion for summary judgment, plaintiff may not rely on mere allegations or denials of evidence of record produced by defendant but must "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). This she has failed to do.

For all these reasons, even if there was proof in this record that plaintiff suffered with a disability, defendant is entitled to the entry of summary judgment in its favor as to Count I.

## VI

### Count II—Promotion and Assignment to Work Projects

In Count II, plaintiff has alleged that because of her disability, defendant failed to promote her or to assign preferred work projects to her in spite of her qualifications and favorable evaluations. Relying on *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981), defendant contends that the employment actions challenged by plaintiff do not constitute actionable "adverse employment actions" under the ADA. This Court would agree. Plaintiff has not produced evidence indicating that defendant took any adverse employment action against her because of her disability.

In *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986), the Fourth Circuit concluded that "employment discrimination laws require as an absolute precondition to suit that some adverse employment

actions have occurred." In determining whether there has been discrimination with respect to "personnel actions," a court should focus on the question whether there has been discrimination "in what can be characterized as ultimate employment decisions, such as hiring, granting leave, discharging, promoting and compensating." *Page,* 645 F.2d at 233. There are "many interlocutory or mediate decisions" which have no immediate effect upon employment conditions and which were not intended to constitute a basis for the assertion of a claim of discrimination. *Id.* In *Munday v. Waste Management of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997), the Court stated:

> In no case in this circuit have we found an adverse employment action to encompass a [particular] situation ... without evidence that the terms, conditions or benefits of [plaintiff's] employment were adversely affected.

■ Applying the principles of *Page* and *Munday* here, this Court concludes that plaintiff is not entitled to proceed to trial on her claim that defendant violated the ADA by not, because of her disability, assigning preferred work projects to her. In deciding that plaintiff should not be assigned to a work project desired by her, defendant made an interlocutory or mediate decision rather than an ultimate employment decision actionable under the ADA.

■ Nor may plaintiff go to trial on her Count II claim that defendant failed to promote her because of her disability. One of the elements that a plaintiff must prove to establish a *prima facie* case of discriminatory failure to promote is that he or she applied for the position in question. *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994). Plaintiff made only two requests which might inferentially be considered to be applications for promotion. The first was her request that she be assigned to work on the Cancer Center Project. This request, however, cannot be deemed to be an actionable application for promotion. Had plaintiff been assigned to work on that Project, her pay grade, salary and job title would not have changed. Denial of the requested assignment did not under *Munday* constitute an adverse employment action, since the terms, conditions and benefits of plaintiff's employment would not have been adversely affected had she been assigned to work on the Cancer Center Project.

■ Plaintiff next relies on the request she made to the Hospital's management to have a new position created for her. She asked that the position of Director of Internal Design be created and that she be assigned to that position. This request was denied. Clearly, no adverse employment action was taken by defendant when it refused to create a brand new position for plaintiff. Plaintiff was not denied a promotion because there was no existing position for which she could have applied or to which she could have been promoted. Certainly, the ADA does not permit a claim to be brought by an employee on the ground that her request that a new position be created for her was discriminatorily denied. Such a claim is not maintainable under the Act.

For all these reasons, this Court concludes that even if plaintiff were able to prove that she suffered from a disability, defendant's motion for summary judgment must be granted as to Count II of the complaint.

### VII

#### *Count III—Discharge*

In Count III of the complaint, plaintiff alleges that defendant violated the ADA by discharging her because of her known disability. Even if plaintiff were able to prove that her asthma constituted a disability, the claim asserted by her in Count III must in any event fail.

Evidence of record indicates that plaintiff was not discharged by the Hospital. Plaintiff was on medical leave for some five

months, from April of 1992 to September of 1992. Several months later, in early February of 1993, her physician requested that she be given another medical leave of absence retroactive to February 1, 1993 and continuing through March 15, 1993. Under established policy of the Hospital, a medical layoff may be granted to an employee who applies for a leave of absence for medical reasons but who cannot be spared because of a business necessity. The Hospital decided that business necessity required that plaintiff not be given another medical leave of absence in February of 1993. She was accordingly placed on a medical layoff, and her position was filled during her absence. A regular and reliable level of attendance is a necessary element of most jobs. *Tyndall,* 31 F.3d at 213. Plaintiff had the right upon her return from the medical layoff to retain her bidding rights on vacant positions at the Hospital without losing her seniority. Plaintiff chose not to do so and never returned to work for the Hospital. She has not shown here that she was actually or constructively discharged.

 Even assuming, *arguendo,* that the Court were to find on the present record that plaintiff had made out a *prima facie* case of discrimination under the ADA by showing that she was constructively discharged when she was placed on a medical layoff, summary judgment in favor of the defendant would still be granted as to Count III. Defendant has in this case articulated legitimate, nondiscriminatory reasons pursuant to the Hospital's policy for placing plaintiff on a medical layoff rather than granting her request for another medical leave. It is undisputed that in February of 1993 there were numerous pending work projects at the Hospital which required the services of plaintiff or someone filling her position. Plaintiff in turn has presented no material evidence which would raise a triable issue as to the question whether the Hospital's reasons for placing her on a medical layoff were pretextual. Evidence does not exist indicating that the Hospital had the intention to discriminate against plaintiff because of her disability when she was placed on a medical layoff rather than being permitted another medical leave.

For all these reasons, defendant is also entitled to the entry of summary judgment in its favor as to Count III of the complaint.

## VIII

### *Conclusion*

In sum, the Court has concluded that plaintiff may not proceed to trial in this case because her asthmatic condition did not constitute a disability within the meaning of the ADA. Moreover, even if she were able to prove that she suffered from a disability, the claims asserted by her in Count I, Count II and Count III of the complaint must on the record here fail in any event.

Defendant's motion for summary judgment will accordingly be granted as to all three counts of the complaint. An appropriate Order will be entered by the Court.