**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Raymond Keith SHERMAN, Defendant–Appellee.**

No. 94–2414.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1994.

Decided April 17, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied June 20, 1995.

Thomas Edward Leggans (argued), Office of the U.S. Atty., Crim. Div., Fairview Heights, IL, for plaintiff-appellant.

Andrea L. Smith (argued), Office of the Federal Public Defender, East St. Louis, IL, for defendant-appellee.

Before COFFEY and RIPPLE, Circuit Judges and SKINNER, District Judge.*

COFFEY, Circuit Judge.

Defendant-appellee Raymond Keith Sherman pleaded guilty to possessing a sawed-off shotgun in violation of 26 U.S.C. § 5861(d). The Probation Office determined that his adjusted offense level was 15 and that he had a criminal history category of I, which carried with it an 18 to 24 month prison sentence. The court reasoned that the defendant suffered from an extraordinary physical impairment because of the degree to which he suffered from obesity and asthma, and decided to depart downward 5 levels, pursu-

* Hon. Walter Jay Skinner, United States District Judge for the District of Massachusetts, is sitting by designation.

ant to U.S.S.G. § 5H1.4.[1] After departure, Sherman's guideline range mandated 6 to 12 months incarceration. The court sentenced Sherman to two years probation, with the first twelve months to be spent in home confinement. The government appeals the sentence.[2] We VACATE the sentence and RE-MAND this case to the district court for re-sentencing consistent with this opinion.

## I. FACTUAL BACKGROUND

Raymond Keith Sherman pleaded guilty to possessing a sawed-off shotgun, and signed a stipulation of fact in which he admitted that he sold the unregistered shotgun to an under-cover Illinois State Police Officer who served as an agent on the Southern Illinois Drug Task Force.[3] The Probation Office calculated the defendant's base offense level at 18, but because Sherman accepted respon-sibility for his crime in a timely manner, the Probation Office recommended that he be granted a three level reduction, pursuant to U.S.S.G. § 3E1.1, which set his adjusted of-fense level at 15. Sherman also had a crimi-nal history category of I.[4] The defendant's

guideline range mandated 18 to 24 months incarceration.

At his sentencing hearing, Sherman re-quested a downward departure from the sen-tencing guidelines pursuant to U.S.S.G. § 5K2.11[5] and U.S.S.G. § 5H1.4 because of his "extraordinary physical impairment" of asthma and obesity. The district court had limited evidence before it in support of Sher-man's claim of an "extraordinary physical impairment," almost all of which came from the defendant's own testimony. Sherman stated that he is 6 foot 3 inches tall, and that he weighs approximately 420 to 450 pounds. The probation officer who prepared the Pre-sentence Investigation Report attempted to confirm Sherman's weight, but he was unable to do so because the defendant's weight ex-ceeded the limit of traditional scales.

Sherman further testified that due to the fact that he was overweight and suffered from asthma, he has difficulty breathing whenever he undertakes the slightest type of physical activity, such as rising from a chair. It is interesting to note that the defendant did not take medication, nor had he seen a

---

1. United States Sentencing Guideline § 5H1.4 provides:

   Physical condition or appearance, including physique, is not ordinarily relevant in deter-mining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be rea-son to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprison-ment.

2. 18 U.S.C. § 3742 provides, in relevant part:

   (b) Appeal by the government.—The govern-ment may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence—
   (1) was imposed in violation of law;
   (2) was imposed as a result of an incorrect application of the sentencing guidelines[.]

3. The stipulation reads:

   On January 15, 1992, the defendant met with Inspector Don Graskewicz of the Southern Illi-nois Drug Task Force. Graskewicz was acting in an undercover capacity. During that meet-ing, the defendant sold Graskewicz an F.I.E. 20 gauge sawed-off shotgun for $50.00. The gun has a barrel length of 11 inches, and an overall length of 19 inches. The gun's serial number is 382420. On January 17, 1992, Spe-

cial Agent Glenn Cook with the Bureau of Alcohol, Tobacco, and Firearms determined that the sawed-off shotgun had not been regis-tered in the National Firearms Registry. On January 17, 1992, Special Agent Brett Final with the Bureau of Alcohol, Tobacco, and Fire-arms test-fired the weapon and it functioned as designed.

4. In 1991, Sherman was convicted of Unlawful Delivery of an Alcoholic Liquor to a Minor, a Class A misdemeanor.

5. United States Sentencing Guideline § 5K2.11 states, in relevant part:

   *Lesser Harms*
   ... In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran pos-sessed a machine gun or grenade as a trophy, or a school teacher possessed controlled sub-stances for display in a drug education pro-gram, a reduced sentence might be warranted.
   Sherman argued that he was entitled to this downward departure because he only possessed the shotgun because it was a "neat conversation piece" and he only sold it to buy food for his family because neither he nor his wife had any income. The defendant was not granted a depar-ture based on this provision.

doctor during the year prior to sentencing because he stated that he could not afford to pay for health care. Sherman also suffers from arthritis in his ankles and knees and he claimed that this condition, exacerbated by his weight and asthma, made it impossible for him to exercise. Furthermore, he stated that if he were to become involved in an altercation while incarcerated, he would be unable to defend himself.

The Social Security Administration (SSA) verified for the Probation Office that Sherman had been receiving Supplemental Security Income (SSI) from the Social Security Administration for his "obesity" since December 1, 1991. The probation officer attempted to obtain documentation from the SSA about the precise medical condition that qualified the defendant for SSI, but stated that he was unable to obtain any records or documentation about the defendant's condition from the SSA.[6]

After observing the defendant and listening to his testimony, the district court granted Sherman's motion for a downward departure. The court concluded that because Sherman's weight was "well over 400 pounds," it was "extraordinary in light of the weight of other people that usually appear before this court." The court additionally expressed concern about the possibility of Sherman having "an acute asthma attack in a prison setting" because the judge felt that from the "several prisoner rights cases ... involving asthmatics" that he had seen, the "prison officials seem not to be concerned about" the health needs of asthmatics. The court also stated:

> [W]hen you look at the defendant and consider and look at his weight—and I can just imagine how hard his heart's pumping to get all that blood through his body—if he were ever to have an acute asthma attack in a prison setting in which was [sic] not attended to quickly, the government would find themselves defending a lawsuit, and for failure to provide immediate and necessary medical attention.

Finally, the judge noted that he too suffered from asthma and that he was well aware of the effects that it can have on an individual.

From the original offense level of 15, the district court made a downward departure of five levels, because of the "appearance and condition of this defendant" and sentenced Sherman to two years probation, the first year of which was to be spent in home confinement. Sherman was also ordered to pay a special assessment of $50. The government appeals the sentence (downward departure).

## II.  DISCUSSION

■ The issue before this court is whether the district court, in the exercise of judicial discretion, has made a record sufficient to establish that the defendant is entitled to receive a downward departure based on an extraordinary physical impairment. We review a district court's departure from the Sentencing Guidelines to see if it was reasonable, "in light of the factors dictated by the Guidelines, and the district court's explanations for its departure." *United States v. Carey*, 895 F.2d 318, 322 (7th Cir.1990) (citing 18 U.S.C. § 3742(e)). " 'Reasonableness implies that a sentencing judge must provide articulable reasons, of a type contemplated by the Act and the Guidelines, and based on a sufficiently sound factual foundation to justify a departure from the Guidelines.' " *Id.* (quotation omitted).

■ We have developed a three part test to facilitate this analysis:

> First, we must determine whether the district court has stated adequate grounds for departure. This is a question of law and is reviewed *de novo*. Second, we must determine whether the facts which underlie the grounds for the departure actually exist. This determination is reviewed using the clearly erroneous standard of review. Third, we must determine whether the degree of departure is linked to the structure of the Guidelines. The district court's findings on what degree of departure is appropriate are given deference.

---

**6.** The record is unclear as to exactly what type of information the probation officer tried to obtain

and whether the officer had Sherman's consent to obtain any medical records from the SSA.

*United States v. Hendrickson,* 22 F.3d 170, 175 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994) (citing *United States v. Gaddy,* 909 F.2d 196, 198–99 (7th Cir.1990)). A finding is clearly erroneous when we are left "with the definite and firm conviction that a mistake has been committed." *United States v. Cojab,* 978 F.2d 341, 343 (7th Cir.1992) (citation omitted).

### A.

The determination of adequate grounds for departure is the threshold analysis for our review of Sherman's sentence. The United States Sentencing Guidelines specifically state that "extraordinary physical impairment" can be a basis for a downward departure, U.S.S.G. § 5H1.4, but we have doubts about whether there is sufficient evidence in this record to establish that this defendant's physical condition constitutes an adequate ground for a downward departure. Because the analysis of when adequate grounds exist is inextricably interwoven with the determination of whether there is a factual basis for the departure, we immediately turn to the next element of our review of Sherman's sentence.

### B.

We now review whether there are sufficient facts which underlie the grounds for the departure. In order to support a downward departure, the district court is required to make "particularized findings," for without them, we cannot fulfill our proper function as an appellate tribunal and determine whether the departure was "reasonable." *Carey,* 895 F.2d at 324 (the summary conclusion that a 62 year old man suffering from a brain tumor was entitled to a departure was not a sufficient finding, in and of itself, to support a departure for "extraordinary physical impairment").

Just as the court's reasoning that the defendant's "age and physical condition" in *Carey* were insufficient, in and of themselves, to support a downward departure, Sherman's "appearance and condition," by themselves, are inadequate findings of fact to support the conclusion that he was extraordinarily physically impaired. Aside from the defendant's self-serving statements and the district court's observation of the defendant in court, the only factors which supported Sherman's request for a departure were that the SSA verified that he received SSI because of his "obesity," and the trial judge's belief that the Bureau of Prisons is not sensitive to the medical needs of prisoners with asthma. The record is barren of any explanation on the part of the judge as to how he came to the conclusion that the Bureau is not sensitive to the needs of asthmatics, other than his summary statement that he has seen "several prisoner rights cases before this Court involving asthmatics," and that "prison officials seem not to be too concerned about, and some prisoners have had a difficult time getting inhalers[.]" He at no place in his opinion recites whether or not he has conducted an investigation into the alleged problem he has stated or whether he has visited any federal prison facilities or made any investigation in order that he might determine if the Bureau provides sufficient care for asthmatic prisoners.

Sherman contends that the judge's reasons do constitute "particularized findings" of extraordinary physical impairment but he is mistaken. The only findings the judge made with respect to the defendant were that he was larger than most people he sees in his courtroom, that the defendant suffers from asthma and may need medication, and if he had an attack, the government may be facing a lawsuit. While the judge may have good reason to be skeptical about the Bureau of Prisons' treatment of asthma sufferers,[7] we are unable to discern from this record, upon what specific facts he rests this opinion. In view of the absence of even a scintilla of qualified medical testimony about the severity of Sherman's asthmatic condition, we have grave reservations about the court's ability to

---

7. In February, 1994, the United States General Accounting Office (GAO) issued a report about health care in the Bureau of Prisons (BOP). The report concluded that inmates with chronic illnesses were not receiving proper health care and issued recommendations for improving health care throughout the BOP system. *See* Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited by Lack of Clinical Staff, GAO/HEHS–94–36 (1994).

make a finding that the defendant suffered from an extraordinary physical impairment such that he should not be incarcerated.

The judge made no legal finding with regard to the treatment Sherman was likely to receive in jail in relation to his medical needs, nor did he rely on a competent medical diagnosis of Sherman's condition. Rather, he merely observed the defendant and heard Sherman's own testimony about how his weight and asthmatic condition impact his lifestyle. Much of the judge's rationale for granting the departure seems to have been based on his personal experience of suffering from asthma, rather than from a proper medical assessment of the severity of the defendant's asthmatic condition. The complexity and severity of the judge's problems may be entirely different from that of the defendant. We have reservations about whether the judge was entitled to compare his condition to the defendant's in the absence of competent medical testimony.

■ We are all sympathetic to the seriousness of the physical complications which may arise when one undergoes an asthma attack. But at the same time, we are also bound by the Guidelines and cannot authorize a downward departure from the Guidelines solely because a defendant states in open court that he suffers from obesity and asthma. In order to warrant such a departure, the court must ascertain, through competent medical testimony, that the defendant needs constant medical care, or that the care he does need will not be available to him should he be incarcerated.

We are cognizant of the fact that asthma is a very troubling medical condition. Over 10 million Americans have been diagnosed with asthma and the number is constantly increasing. Between 1979 and 1987, the percent of Americans with asthma increased by about one third, and the death rate from asthmatic attacks nearly doubled. *See* National Institute of Health, "CTS About Asthma," October, 1990. The severity of asthma, however, varies a great deal from person to person.

Symptoms can be mild or life threatening, and the frequency with which a person experiences asthmatic episodes also varies greatly.

With proper treatment, asthmatic symptoms can almost always be controlled. The most important aspect of treatment is for the sufferer to identify and avoid the "triggers" to which he or she is most sensitive. Triggers are what set off the asthma attack, and the most common triggers include viral infections, pollens, mold, cockroaches, dust, dust mites, dairy products, vigorous exercise, cold air, aspirin, cigarette smoke, certain household cleaning products, and occasionally, emotional stress. Additionally, people with asthma can and should exercise; they should not limit physical activity merely because of their asthmatic condition, but rather should develop an exercise plan that includes proper usage of medication to supplement the physical activity. In fact, many Olympic athletes suffer from severe asthma. *Id.*

■ The disparity with which asthma affects people necessitates an individualized medical assessment of the severity of the defendant's condition before a departure is warranted. It is interesting to note that the defendant himself testified that he had gone an entire year without being medicated, much less being treated, by a doctor prior to sentencing, although he did state that the lack of attention he paid to his asthmatic problems resulted from his inability to afford such health care. In light of the fact that Sherman was able to endure an entire year without medical treatment, we are left to speculate as to why the district court reasoned that the defendant either could not continue to go unmedicated or if he did have an attack, why the prison officials could not arrange for his care. Additionally, the court has made no finding of fact that there were no medical facilities, whether private, city, or county, in the vicinity of where Sherman would be incarcerated that would be available to him should he experience an asthma attack that the prison facility itself was not able to handle.[8]

---

8. The sentencing judge's determinations are especially broad in light of the fact that he did not know to which federal facility the defendant would be assigned. When a defendant is sentenced, he is committed to the custody of the Attorney General who assigns him or her to a

■ Because of the sparseness of the record, including, but not limited to, the disparity with which asthma affects different people, and the lack of specificity about where Sherman would be incarcerated, we must remand this case to the district court in order that it may make "particularized findings" of why Sherman is entitled to receive a downward departure. Should the district court decide to grant a departure, it is required to detail findings of fact regarding Sherman's particular medical needs, at the time of sentencing, in relation to the conditions he would likely face if incarcerated.[9] The court must rely on the testimony of competent expert medical witnesses,[10] and must make a factual finding that the Bureau of Prisons is not able to care for Sherman's medical problems.[11]

On remand to the district court, we do not attempt to define what constitutes an "extraordinary physical impairment" for that determination should be left to the trier of fact because it is a legal conclusion inextricably based on the particular facts of each case. The district court is certainly free to look to other courts for guidance to see what they considered an "extraordinary physical impairment." *See, e.g., United States v. LeBlanc,* 24 F.3d 340, 348–49 (1st Cir.), *cert. denied sub nom., Weinstein v. United States,*

— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994) (a heart condition that could be treated with medication is not sufficient to warrant downward departure); *United States v. Streat,* 22 F.3d 109, 112–13 (6th Cir.1994) (sentence vacated and remanded to make particularized findings of whether AIDS is an extraordinary impairment); *United States v. Goff,* 6 F.3d 363, 366 (6th Cir.1993) (a wheelchair bound quadriplegic is not entitled to the departure); *United States v. Slater,* 971 F.2d 626, 634–35 (10th Cir.1992) (finding that borderline mental retardation, chronic major depressive disorder, scoliosis and disabling back pain are not adequate grounds without particularized findings); *United States v. Greenwood,* 928 F.2d 645, 646 (4th Cir.1991) (double amputee whose treatment would be jeopardized in prison is granted a departure).

## C.

■ The general authority to depart from the Guidelines is found in U.S.S.G. § 5K2.0 which states that

the sentencing court may impose a sentence outside the range established by the applicable guideline if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

---

specific institution. 18 U.S.C. § 4082. Without even knowing where the defendant would be incarcerated, the judge made the broad generalization that no prison could adequately care for Sherman's needs. We refuse to accept such generalizations and require that the judge make more detailed findings.

9. We note that pursuant to 18 U.S.C. § 3552(b), prior to or at sentencing, the district court can request the Bureau of Prisons to investigate and report back to the court concerning any questions the court may have about the adaptability of the prison facilities to treat any medical problems the defendant may have.

10. The court should also bear in mind that fact that, in all likelihood, if incarcerated Sherman will probably receive asthma medication and may be placed on a specialized diet to help him lose some weight.

11. Federal prisoners are supposed to have treatment for all their health care needs.

*There are virtually no medical problems that the Bureau's health care delivery system cannot respond to adequately, either within its institu-*

*tions or on a contract consultant basis. The system includes local medical facilities, as well as major medical facilities that provide specialized or intensive medical or mental health care.* Federal inmates have ready access to health care at a level comparable to that available to mainstream society.

On-site emergency medical care is available 24 hours a day in almost all Bureau facilities. Those with no constant medical staff coverage in the institution have alternate professional medical coverage available....

Specialized health care resources are expensive and in constant demand. Therefore, whenever possible, offenders requiring such care remain in regular institutions, a number of which are equipped with special facilities and services.... *Additionally, the climate is considered when making designations.*

...

Inmates whose health care needs exceed those services available in a typical institution may be transferred to a Bureau major medical center ... depending on the medical needs their case presents.

The Department of Justice, A Judicial Guide to the Bureau of Prisons, 29 (1992).

Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'

(Quoting 18 U.S.C. § 3553(b)). While any departure is viewed deferentially by this court, we do review the degree of departure to determine if it is linked to the structure of the Guidelines. *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990). This means that district courts must:

> employ the rationale and methodology of the guidelines when considering cases not adequately addressed by existing guidelines. The sentencing judge is thus required to articulate the specific factors justifying the extent of his departure and to adjust the defendant's sentence by utilizing an incremental process that quantifies the impact of the factors considered by the court on the defendant's sentence.

*United States v. Thomas,* 930 F.2d 526, 530 (7th Cir.), *cert. denied,* 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). " 'Significant departures—those of more than two levels—must be explained with a care commensurate with their exceptional quality.' " *United States v. Seacott,* 15 F.3d 1380, 1389 (7th Cir.1994). The method of departure must be made with reference to the rationale or methodology of the Guidelines. *Id.*

Should the district court wish to downwardly depart, it will have to do so with reference to the Guidelines and its provisions. In *United States v. Schmude,* we suggested that departures be made with an eye to the "structure of the Sentencing Table found in the Guidelines" because it is a "useful tool in determining how much of a departure is 'reasonable.' " 901 F.2d 555, 560 (7th Cir.1990).

We note that at the original sentencing hearing, the court discussed another defendant who was going to be sentenced for fraudulently obtaining thousands of dollars of loans from various financial institutions. The other defendant was also supposed to be sentenced to 18 to 24 months in prison and the judge commented:

> When I compared the two offenses, at least in my mind there was, there was no comparison. I mean his was truly a white collar crime. [The defendant's crime] is considered in terms of sentencing, and I guess in terms of societal perception a

violent crime in the sense it involves a gun, but the facts of this situation as, of this particular case resulted in a lot less harm than the facts of the [other] case. And I found that a little disturbing in terms of the restrictions that this Court has to abide by with regard to the sentencing guidelines.

We have previously held that "[j]udges are not free to reject the Guidelines out of hand, nor are they at liberty to impose personalized sentencing agendas. The Guidelines, over which there has been much scholarly debate, have been found to be a constitutional act of Congress and must be followed." *United States v. Thomas,* 906 F.2d 323, 329 (7th Cir.1990). If the court persists in downwardly departing, it will have to do so within the framework of the existing Guidelines and their structure and purpose, not dissatisfaction with the determinations of and provisions drafted by the Sentencing Commission.

### III. CONCLUSION

The defendant's sentence is VACATED and this case is REMANDED to the district court for re-sentencing consistent with this opinion.