UNITED STATES of America,
Plaintiff,

v.

Sandra RHODES, Defendant.

No. 03–20008.

United States District Court,
C.D. Illinois.

Oct. 30, 2003.

Timothy A. Bass, Office of U.S. Attorney, Urbana, IL, for Plaintiff.

J. Steven Beckett, Carol A. Dison, Beckett & Webber, P.C., Urbana, IL, for Defendant.

## AMENDED[1] FINAL DISPOSITION ORDER

BAKER, District Judge.

This case is before the court for final hearing and entry of an order of final disposition. The United States appeared through Timothy Bass, Assistant United States Attorney. The defendant appeared personally accompanied by her attorneys, J. Steven Beckett, Esq. and Carol A. Dison, Esq.

The defendant has been read the presentence report and discussed it with her counsel. She has no objections to the contents of the report.[2] The government has raised no objections to the report. The court accepts and adopts the statements contained in the presentence report.

### I.

The defendant, Sandra Carol Rhodes, is a forty-eight year old, college educated, white female. She has plead guilty to one count of possession of between 50 and 150 grams of the controlled substance methamphetamine with intent to distribute it. She has also plead guilty to one count of money laundering. Both offenses are Class C felonies. In the course of her criminal activities Rhodes is accountable for a total of 24 pounds 14 ounces of methamphetamine, 24 ounces of glass, and 8 pounds of cannabis. The total amount of funds she laundered is between $85,000 and $100,000. This is her first offense. She has no prior convictions, but she was

not a small time drug dealer and her offenses must rank as serious and substantial. Under the guidelines applicable to the combined counts, at offense level 37 in Zone D, her guideline sentence would be between 210 and 262 months of incarceration followed by not less than three years of supervised release. She is further subject to a fine of between $20,000 and $1,500,000. As the presentence report shows, her financial condition would not support a fine. She, of course, must pay the statutory special assessment of $100 on each count of conviction. The offenses are not probationable.

The government has moved, pursuant to U.S.S.G. § 5K1.1, for a downward departure from the minimum guideline sentence based on Rhodes' substantial assistance to authorities. The government recommends that the court reduce the minimum guideline sentence by 30%.[3] The defendant has moved, pursuant to U.S.S.G. § 5H1.4, for a downward departure based upon Rhodes' physical condition. The defendant further objects to the 30% reduction recommended by the government and argues that Rhodes' assistance was far more valuable to the government than its assessment of that value and exposed her to greater danger, and that she should receive a far greater reduction in the minimum sentence. The court will first consider the defendant's motion for departure under § 5H1.4.

---

1. The government has moved for clarification of the final disposition order filed on October 21, 2003. The government argues correctly that a sentence in Zone C of 10 to 16 months must be satisfied by at least five months imprisonment and may not be satisfied by twelve months of home confinement. The court misapprehended the provisions of § 5C1.1(d)(2) and, in error, interpreted that section as allowing a substitution of home confinement for the period of imprisonment. This amended order corrects that misapprehension and imposes the sentence the court considers just under its findings.

2. Defense counsel raised some objections to the report as originally submitted but those objections were worked out informally with the reporting probation officer and were withdrawn.

3. That would be a sentence at offense level 24 in Zone D.

## II.

As set forth in *United States v. Sherman,* 53 F.3d 782 (7th Cir.1995), in order to support a downward departure, the district court is required to make "particularized findings." The following extensive quote is a guide to the court on how to proceed.

[We] do not attempt to define what constitutes an "extraordinary physical impairment" for that determination should be left to the trier of fact because it is a legal conclusion inextricably based on the particular facts of each case. The district court is certainly free to look to other courts for guidance to see what they considered an "extraordinary physical impairment." *See, e.g., United States v. LeBlanc,* 24 F.3d 340, 348–49 (1st Cir.1994), *cert. denied sub nom., Weinstein v. United States,* 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994) (a heart condition that could be treated with medication is not sufficient to warrant downward departure); *United States v. Streat,* 22 F.3d 109, 112–13 (6th Cir.1994) (sentence vacated and remanded to make particularized findings of whether AIDS is an extraordinary impairment); *United States v. Goff,* 6 F.3d 363, 366 (6th Cir.1993) (a wheelchair bound quadriplegic is not entitled to the departure); *United States v. Slater,* 971 F.2d 626, 634–35 (10th Cir.1992) (finding that borderline mental retardation, chronic major depressive disorder, scoliosis and disabling back pain are not adequate grounds without particularized findings); *United States v. Greenwood,* 928 F.2d 645, 646 (4th Cir.1991) (double amputee whose treatment would be jeopardized in prison is granted a departure).

The general authority to depart from the Guidelines is found in U.S.S.G. § 5K2.0 which states that:

the sentencing court may impose a sentence outside the range established by the applicable guideline if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

While any departure is viewed deferentially by this court, we do review the degree of departure to determine if it is linked to the structure of the Guidelines. *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990). This means that district courts must employ the rationale and methodology of the guidelines when considering cases not adequately addressed by existing guidelines. The sentencing judge is thus required to articulate the specific factors justifying the extent of his departure and to adjust the defendant's sentence by utilizing an incremental process that quantifies the impact of the factors considered by the court on the defendant's sentence. *United States v. Thomas,* 930 F.2d 526, 530 (7th Cir.1991), *cert. denied,* 502 U.S. 857, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). " 'Significant departures—those of more than two levels—must be explained with a care commensurate with their exceptional quality.' " *United States v. Seacott,* 15 F.3d 1380, 1389 (7th Cir.1994). The method of departure must be made with reference to the rationale or methodology of the Guidelines. *Id.*

53 F.3d at 788–89.

### A.

The court makes the following particularized findings about the following special physical conditions that afflict the defendant Rhodes. In doing so the court has considered the testimony of Dr. John W. Newlin, one of Rhodes' treating physicians; John Herrington, a private clinical

social worker counseling Rhodes; Star Jestis, the blind rehabilitation worker helping Rhodes; Dr. T.J. Ballom, clinical director at Carswell, Texas, FCI; Jean Marzen, physical therapist at Carswell FCI; Daniel Chastain, Carswell FCI Administrator; Geniel Grabowski, social worker from the Illinois Department of Rehabilitation, and the contents of the presentence report.[4]

1. Defendant Rhodes acknowledged that in August 1997, she became heavily involved in using and distributing methamphetamine. Apparently in conjunction with her drug dealing activities, the defendant was attacked in her home by an unknown assailant in January 1998. While fending off her attacker, she was shot in the hand. Nevertheless, her involvement in drug trafficking continued.

2. The defendant was attacked a second time at her home on December 5, 1998. During this brutal assault, defendant Rhodes was hit in the head/face with a weapon and left for dead. As a result, she was blinded in both eyes and suffered from extensive head and brain injuries. The defendant's attackers, John Tom Mardi, Christopher Allen, and Gregory Kaufman, were eventually tried and convicted in Macon County (Illinois) Circuit Court of Home Invasion and/or Attempted First Degree Murder, and sentenced to prison terms ranging from 6 years to 45 years.

3. In late 1999, defendant Rhodes returned to Decatur. She briefly lived with her half-sister, Rebecca Maynard, in Maynard's home. The defendant then moved into a home which she inherited from her mother's estate. Presently, the defendant lives alone in this modest home in a middle-income Decatur neighborhood. With assistance from a rehabilitation counselor, personal assistants, and an independent

living specialist, the defendant continues in her efforts to adapt to being blind. Presently, two women work separately with the defendant for several hours each day, assisting her with meal preparation, housekeeping, and medical care.

4. As confirmed by Rebecca Maynard, the defendant is a very active member of Salem Baptist Church in Decatur. The defendant noted that she receives informal spiritual counseling from her minister. The defendant has spoken to various church youth groups about her history of drug use and drug trafficking. With the assistance of her rehabilitation counselor, the defendant is also planning to speak with various groups of youthful offenders and those at risk of abusing drugs.

5. Defendant Rhodes is currently receiving services through the Illinois Department of Human Services, Office of Rehabilitation, Bureau of Blind Services. She has worked closely for several years with Genial Grabowski, M.S.W., a senior rehabilitation counselor. Ms. Grabowski commented that she has seen defendant Rhodes make great progress in her attempts to adapt to her blindness. Ms. Grabowski stated that people who are blind can learn to see in other ways than the sighted, but they need to be in an environment that is conducive to such. If a blind person allows others to do everything for them, their ability to learn to do for themselves is impaired. According to Ms. Grabowski, this is the case with defendant Rhodes. She noted that the defendant *must* learn independent living skills in order to adapt as a blind person in a sighted world; and the longer the delay in this process, the greater the likelihood that the blind person will become dependent on

---

**4.** The court has quoted extensively from the presentence report. That fact does not signify that the court has ignored any other part of the report and has adopted the entire report in support of this final disposition.

others and forgo doing the very hard work it takes to learn to live independently.

6. Ms. Grabowski commented that the defendant is at times quite manipulative, and she must be held accountable. For this reason, Ms. Grabowski hopes to accelerate the defendant's plan for becoming independent by reducing the defendant's dependence on her personal assistants. The defendant's specialized plan includes learning and becoming adept at: Braille, orientation and mobility; independent living skills (cooking, homemaking, labeling clothes, sewing, and housekeeping), and computer communication skills with a talking computer. The defendant's ultimate goal and desire is to develop her skills to the point where she can be employed outside the home.

7. Ms. Grabowski noted that defendant Rhodes' plan now includes the assistance of an independent living specialist, Star Jestis. Ms. Jestis is herself blind, but very skilled and independent. Ms. Jestis works for ten hours each week with the defendant, assisting her in honing her independent living skills. In order to monitor the defendant's progress, Ms. Jestis, Ms. Grabowski, a home services nurse, and Ms. Jestis's supervisor meet monthly with the defendant to review and evaluate her plan. As the defendant becomes more adept at managing her own life, her specialized plan will change accordingly.

8. Ms. Grabowski related that the defendant is working hard to learn to live independently, although she is hampered by a multitude of medical problems and some emotional issues (depression and anxiety). Ms. Grabowski has noticed the defendant's self-esteem growing as she obtains more control over her life. Ms. Grabowski believes that with defendant Rhodes' wonderful command of the English language, she could make a significant contribution to society by using her history with drugs to communicate with young people at risk (i.e. community service in the Macon County Circuit Court drug court program). Ms. Grabowski concluded by advising that the defendant's hard work could be severely disrupted by placement in a prison where she would likely become dependent once again on others to meet her needs.

9. Defendant Rhodes suffers from Graves Disease, which is in remission. In 1998, her thyroid gland was sterilized by clinical irradiation at Mayo Clinic in Rochester, Minnesota. She is now dependent on synthetic thyroid medication to regulate her endocrine system and her metabolism. Graves Disease results in muscle weakness.

10. Since 1996, defendant Rhodes has been treated for adult-onset diabetes. She is medicated with Glucotrol and Actos to control this disease, and must repeatedly check her blood sugar with a blood glucose meter on a daily basis.

11. As a result of the assault on her in December 1998, the defendant is totally blind in both eyes, with no perception of either light or form. Following the attack, the defendant underwent a right frontal craniotomy, debridement of devitalized right frontal lobe, evacuation of a right temporal lobe hematoma, and repair of right supraorbital and facial laceration. The defendant's right eye was removed. Her left eye remains in its socket, but it is non-functional. She wears ocular prostheses in both eyes, which must be treated with topical antibiotics to prevent infection.

12. Also because of the trauma from this assault, the defendant experiences epileptic seizures of the brain. As recently as April 2002, she was hospitalized for injuries she suffered as a result of experiencing brain seizures. She is presently treated with Carbatrol, an anti-seizure medication. Defendant Rhodes also suf-

fers from intermittent severe pain in her head, as a result of the assault.

13. The defendant was diagnosed with asthma in 1986. During the assault on the defendant in December 1998, she suffered multiple fractures of her facial bones and her skull. Multiple sinus cavities were collapsed or ruptured as a result of the trauma that was inflicted. As a result, defendant Rhodes underwent multiple surgical procedures in an attempt to reconstruct and modify her sinus system, but she now suffers from chronic sinus mucous drainage. Because the mucous drainage affects the defendant's asthma, she is prone to asthma attacks.

14. Because the defendant previously weighed over 470 pounds, in May 2001, she underwent bariatric surgery. In December 2002, she was hospitalized for the repair of an abdominal hernia and a "tummy tuck." During 2003, she was hospitalized repeatedly for staph infections and the repair of a hernia. Following the surgery, the defendant was hospitalized repeatedly for staph infections and had open wounds which required daily dressings. On May 8, 2003, the defendant underwent surgery to repair the open abdominal wounds. On June 24, 2003, the defendant had another surgery to address problems resulting from the prior surgery and to repair a new hernia.

15. In 2000, the defendant was diagnosed with sleep apnea. To monitor her breathing while asleep, she is hooked up to a CPAP machine at night.

16. Presently, the defendant takes the following medications: Glucotrol and Actos (for high blood sugar), Synthroid (thyroid), Carbatrol (for brain seizures), Zoloft (antidepressant), Ambien (sleep aid), and an eye ointment to prevent infection.

17. Defendant Rhodes' medical records reflect that she suffered severe depression and post traumatic stress disorder following the attack in December 1998. Physi-

cians' reports reveal that the defendant's mental health is improving, however, she remains medicated with the anti-depressant, Amitriptyline.

18. Rebecca Maynard confirmed that defendant Rhodes suffers from depression, although the defendant's mental health appears to be gradually improving.

19. Defendant Rhodes acknowledged that she has used alcohol and a variety of illegal drugs, including marijuana, cocaine, methamphetamine, and LSD. She said she began smoking marijuana on a recreational basis at age 12. At approximately age 30, she began using methamphetamine. By age 43, she was snorting methamphetamine on a daily basis. She said she typically used one-eighth ounce of methamphetamine during the work week and one-sixteenth ounce of methamphetamine on weekends. She noted that she continued smoking marijuana, typically about one-quarter ounce every couple of weeks, until she was blinded in 1998.

20. John W. Newlin, M.D. is a licensed physician in private practice in Decatur, Illinois. His specialty is general internal medicine. Rhodes has been his patient for the past seven or eight years. He confirms her massive head wounds, fractured sinus and removal of her right eye. He confirms her susceptibility to seizures and infection. He described her morbid obesity, her diabetes, Graves Disease and sleep apnea for which she uses a CPAP machine at night. He expressed concern for her continued medical care in prison and describes her as requiring "diligent medical treatment" by which he meant that she requires continuous blood sugar monitoring, seizure medication and use of the CPAP machine. He agreed that he was not familiar with the medical facilities in the Federal Bureau of Prisons.

21. John Herrington is a clinical social worker in private practice. He has been

counseling Rhodes since March of 2003. Herrington expressed concern for Rhodes' stability if incarcerated. Her blindness makes her subject to abuse and loss of personal care. Isolation, to protect her from abuse, would have a detrimental effect on her emotionally. She needs, in Herrington's opinion, to be socially involved. In Herrington's opinion, and that is not contested by any witness or the government, Rhodes is not a risk for further anti-social behavior because of her remorse and her blindness. Herrington has treated about fifty persons who have been incarcerated but had no special familiarity with the Federal Bureau of Prisons.

22. Star Jestis is employed by the Illinois Department of Rehabilitation. Jestis is blind from age seventeen and works as a teacher of independent living skills. She described Rhodes as making wonderful progress. She is doing basic housework and some cooking. She has mastered Braille I and is moving to Braille II. Jestis says it was hard to get Rhodes started and that incarceration would set her back because of loss of security and stability. In August 2003, Rhodes was operating at about 50% of her capacity for independent living. Jestis was not familiar with the treatment available in federal prison.

23. T. J. Ballom, M.D., whose area of emphasis is family practice, is the clinical director of the FCI at Carswell, Texas. From her testimony it is apparent that Rhodes, if incarcerated, will be sent to Carswell since that is the only female medical facility operated by the Bureau of Prisons. Dr. Ballom describes Rhodes as a person with a challenging, chronic medical condition. Carswell has a general population and a medical population with a psychiatric unit. There are about 500 inmates in the medical unit and another 900 in the general population. There is no separation of the general population from the medical unit and the inmates have the ability to pass freely between them. Dr. Ballom, repeating what she was told by the business manager, says the average cost to maintain an inmate at Carswell is $36,000 per year. That is an average that does not measure the expense for an individual with special needs. Dr. Ballot had no foundation to form an opinion as to the actual cost of maintaining Rhodes at Carswell and was not responsible for budgeting. She has had no experience in dealing with a blind prisoner with special medical needs.

24. Jean Marzen is a physical therapist at Carswell. She had a brief experience on a few occasions of acting as an escort within the institution for a worker from the Lighthouse For The Blind who came to assist a blind inmate gain skills at navigating with a cane and trying to achieve independent ambulation.

25. Daniel Chastain is the Hospital Administrator at Carswell. He is responsible for budgeting and is familiar with the costs of maintaining individual inmates with special medical needs. Chastain said that in his opinion, as an educated guess, based on his experience at Carswell, he would estimate the annual expense of maintaining Rhodes at Carswell was between $75,000 and $100,000. He described what would happen to Rhodes if she was placed at Carswell. Initially she would be placed in 24–hour observation for evaluation. She would then be assigned to a room where she would have a cellmate who would act as her guide about the institution and lead her to meals and other activities within the institution. Rhodes would be dependent on that companion. Chastain said that for inmate needs outside of necessary or mandatory medical procedures he would have to follow Bureau parameters but he did not know what they would be in Rhodes' case. He never encountered a request for training outside the institution in Braille or

preparation of a blind person for employment.

26. Genial Grabowski is a social worker with the Illinois Department of Rehabilitation. She has a M.S. in social work and has years of experience with rehabilitation and relocation of blind people. She has successfully placed about 500 blind persons in employment service. Rhodes has cost the state about $10,000 a year for the past five years for personal assistance. By January 2004 that cost will be reduced to zero because under the plan Grabowski has established for Rhodes, she will not be provided a personal assistant after January 2004 and must function in her home independently. After January 2004, however, Rhodes' vocational costs will increase because she will embark on a program of vocational training for a blind person. Grabowski was present in the courtroom throughout the testimony of the witnesses from the Carswell FCI. Grabowski was of the opinion that if sent to Carswell, Rhodes would lose the independence of movement and self-sufficiency that she has gained. She would become dependent and require constant personal assistance. If Rhodes loses the impetus to self-sufficiency and support, she will fall back into the state of anxiety, depression and dependency that she entered after she was attacked and blinded. The repetition in caring for herself that leads to self-sufficiency and independence would be lost in prison.

27. The reporting probation officer interviewed Mark Canaan of the Bureau of Prisons, Chicago Community Corrections Office, about the availability of services within the Bureau for blind prisoners. From that interview, the reporting probation officer formed the opinion that the Bureau of Prisons has no facility that can address Rhodes' specific conditions.

28. The court finds from this testimony that if Rhodes is placed at Carswell, and it is obvious that she will go no other place,

she will lose the self-sufficiency and independence of movement that she has gained so far in her rehabilitation by the State of Illinois. She will be dependent upon another inmate assigned to her as a guide and personal assistant. She will lose the impetus to gain vocational independence and return to the state of anxiety, depression and dependence that followed her being blinded in the attack.

29. The court finds that her physical condition makes her especially vulnerable in a prison setting. Moreover, her assistance to the government creates a likelihood of retaliation by other inmates. Her former allies have tried to kill her and there is no reason to think that given the chance they would not try again. Carswell is a free access institution with 900 inmates in general population. The court is not so naive or inexperienced about prison life not to recognize that a blind person, especially a "snitch," is vulnerable to abuse and mistreatment by other inmates.

30. If Rhodes was not blind and suffered only from her many chronic physical ailments, the court finds that Carswell could handle her. But given the primary concern about the blindness and vulnerability to abuse, Carswell is not going to provide the treatment or security she is receiving in Decatur.

**B.**

■ When I went to law school fifty years ago, we were taught that the primary end of the criminal law was rehabilitation. The criminal law was fashioned after a medical model and corrections was the goal. That approach was abandoned in the 1980s and the ends of the criminal law now are first, punishment or retribution, then deterrence and incapacitation and finally, a distinct last, rehabilitation. But assuming as we must that rehabilitation is now the last concern of the criminal law, it

is still a significant factor in deciding the extent of proper departure from a guideline sentence. Section 5H1.4 provides:

> However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range, *e.g. in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.* (emphasis added).

A question the court must resolve is this: how will the ends of the criminal law best be served, by incarcerating Rhodes or by continuing her in her present program with the assistance of the State of Illinois? To do that, the court compares what we can expect at Carswell with the results of the home detention she is now under.

Carswell does not have the programs that are available in home detention. As pointed out above, at Carswell she will most probably lose the independence and self-sufficiency she has already gained and will relapse into the anxiety, depression and dependency that Grabowski described.

The cost of maintaining Rhodes in Decatur is less than the cost to society to keep her at Carswell.

Will punishment be served? Certainly at Carswell she will be punished and we will exact retribution for her criminal conduct. But punishment by incarceration at Carswell pales compared to the punishment she has already received from her fellow criminals and the prison to which they have consigned her.

Will deterrence be accomplished? She is not going to commit other crimes. She is incapacitated from doing that and as Herrington testified her blindness and remorse for her actions make recidivism most unlikely. More important, her community work in talking to people in drug programs and to young people who are at risk for drug use can work as a deterrent to others.[5]

## III.

The court will now consider the adequacy of the government's recommendation of a 30% reduction in the minimum guideline sentence for the defendant's substantial assistance to authorities. The defense urges that the recommendation does not adequately reflect the quality of the assistance. The court agrees.

The application notes to § 5K1.1 instruct the court to give substantial weight to the government's evaluation of the extent of the defendant's assistance "particularly where the extent and value of the assistance are difficult to ascertain." Well, the extent and value of the assistance are not difficult to ascertain in this case. The record supports the defense contention that without Rhodes' assistance, the government would not have been able to make a case against De los Rios, the Los Angeles police officer, a truly evil man, who was Rhodes' source in the drug trade and who had ties with the Mexican Mafia. In addition, she was instrumental in the indictment and conviction of her two fellow drug traffickers, Weaver and John. Her testimony for the state authorities also resulted in the conviction of the three persons who attacked and blinded her. There is no question about her truthfulness, completeness and reliability. The prosecutor in his statements to the court in support of the downward departure stipulated to them. But the government downplays or ignores the further danger or risk of injury to the defendant from her full cooperation with the authorities and her seriously infirm physical condition. It takes the position that is unsupported by the record that the Bureau of Prisons can adequately protect her from abuse and provide rehabilitative

---

**5.** She made a moving and eloquent statement in allocution.

programs comparable to what she receives in Decatur in home confinement.

### A.

The court allows the government's motion for a downward departure but sustains the defense objection to the recommendation by the government for a 30% reduction in the minimum guideline sentence. The court concludes that a just result considering the nature and extent of the defendant's cooperation, its usefulness to the authorities, her truthfulness and completeness, and the risk of further injury to her because of that cooperation and because of her seriously infirm physical condition, calls for a sentence of home confinement following minimum incarceration within the parameters of the guidelines in Zone A felony cases. The court departs to offense level 8 (a Zone A sentence) that calls for a sentence of 0–6 months. As a sentence of home confinement is appropriate, because home confinement will be as efficient and less costly than imprisonment, the court will impose a sentence of one day imprisonment and 5 months and 29 days of home confinement followed by three years of supervised release.

■ The court further allows the defense motion for a downward departure under § 5H1.4 and concludes that a sentence of home confinement within the parameters of the guidelines in Zone A felony cases is appropriate. The court departs to offense level 8 (a Zone A sentence) that calls for a sentence of 0–6 months. As a sentence of home confinement is appropriate, because home confinement will be as efficient and that requires the defendant to serve a minimum term of five months imprisonment. As a sentence of home confinement is appropriate, because home confinement will be as efficient and less costly than imprisonment, the court will impose a sentence of one day imprisonment and 5 months and 29 days of home confinement followed by three years of supervised release.

### B.

In closing, the court is genuinely puzzled by the government pressing this case. True, Rhodes is guilty of serious criminal conduct but, as observed above, it is truly questionable how the ends of the criminal law are served by incarcerating this woman for eleven years. The government waited until within six months of the running of the statute of limitations against Rhodes' offenses before initiating prosecution. The greatest power the United States Attorney possesses is deciding not to prosecute someone because the ends of the criminal law will not be served. The court is aware of the current policy of the Department of Justice to seek the maximum penalty in all prosecutions. In a recent speech announcing his new directive to prosecutors to seek maximum penalties, Attorney General Ashcroft said it was aimed at putting away "child predators, criminal bosses, drug kingpins and violent gun criminals." I couldn't agree more with General Ashcroft. That is a sound policy. But Sandra Rhodes is none of the criminals he mentioned as targets.

### IV.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Sandra Rhodes, is sentenced to a term of six months to be satisfied by imprisonment for one day and home confinement for five months and twenty-nine days. Said term shall apply on each of Counts 1 and 2 and be served concurrently.

The Court finds that the defendant does not have the ability to pay a fine, either immediately or through installment payments.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. This term shall consist of three years on each of Counts 1 and 2 to be served concurrently.

Within 72 hours of release from confinement, the defendant shall report in person to the probation office in the district to which the defendant is released.

The Court finds the defendant is subject to the mandatory drug testing provisions of 18 U.S.C. § 3583(d) and orders the defendant to submit to one drug test within 15 days after being placed on supervision and two drug tests thereafter, as directed by the U.S. Probation Officer.

In addition to the standard conditions of supervision, the defendant shall comply with the following special conditions:

1. You shall serve 12 months in home confinement during your term of supervision. You shall sign the rules of home confinement/electronic monitoring (EM) and comply with the conditions of home confinement. During this time, you will remain at your place of residence except for employment and other activities approved in advance by your probation officer. You shall wear an EM device and you shall pay the cost of this program as directed by your probation officer.

2. You shall refrain from any use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician. You shall, at the direction of the probation office, participate in a program for substance abuse treatment, including testing to determine whether you have used controlled substances and/or alcohol. You shall pay for these services as directed by the probation officer.

3. You shall perform 500 hours of uncompensated community service during the first 34 months of supervision and shall provide verification of said service as directed by the probation officer.

4. You shall participate in psychiatric services and/or a program of mental health counseling/treatment as directed by the probation officer and shall take any and all prescribed medications as directed by the treatment providers. You shall pay for these services as directed by the probation officer.

5. You shall not own, purchase, or possess a firearm, ammunition, explosive device or other dangerous weapon.

6. The defendant is to surrender herself to the United States Marshal in the United States Court House in Urbana, Illinois at 9:00 a.m. on Monday, October 20, 2003 to serve her one day of incarceration ordered herein.